UNITED STATES COURT OF APPEALS
For the Fifth Circuit

_____

No. 99-41068
_____

JAMES ROY KNOX,

Petitioner-Appellant,

VERSUS

GARY L JOHNSON, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

August 21, 2000

Before DAVIS, SMITH and WIENER, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

James Roy Knox appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus seeking to set aside his June 22, 1994 conviction and death sentence for murder in the course of a robbery. Knox contends that the district court erred in granting summary judgment against his numerous challenges to the constitutionality of his conviction. For the reasons that follow, we affirm the judgment of the district court.

-1-

On November 10, 1982, at approximately 5:30 p.m., a man entered Joe's Pharmacy in Galveston, Texas, brandishing a dark semiautomatic pistol. He pointed the pistol at the pharmacist, Joe Sanchez, and his assistant, Ronald Dale Dyda, and demanded money and drugs. The robber, described by Dyda as a thin unshaven white male, approximately six feet tall, ordered Sanchez and Dyda to "get down on the floor." When Sanchez refused to comply, the robber gave Dyda some medical tape and told him to bind Sanchez's hands.

Sanchez resisted, pulling his hands apart and instructing Dyda not to give any money to the robber. As Sanchez freed himself, the pharmacy phone rang. Sanchez answered the phone and heard Joanne Seelbach, a long-time customer, on the line. Seelbach testified that Sanchez answered the phone as usual, but then yelled, "I don't know where the dope's at." Seelbach testified that she heard an unfamiliar male voice demand, "I want the Goddamn dope" and threaten, "You son-of-a-bitch, I am going to kill you." Seelbach then heard a shot ring out and overheard the unfamiliar male voice state, "now you will give me the dope you son-of-a-bitch." She immediately hung up and called the police.

Dyda testified that he too heard the gunshot and saw Sanchez fall through a curtain behind the counter. According to Dyda, the robber pointed the gun at him and demanded "Class A" narcotics. Dyda handed the robber four small brown bottles of Demerol and the

cash from the register.  The robber asked for more drugs, but when Dyda turned to retrieve more from the counter, the robber fled out the front door.

Sanchez died shortly thereafter from a gunshot wound to the midchest.  Authorities recovered the bullet and determined that it came from either a .38-caliber or a 9mm gun.

At the time of the robbery, Kathleen Austin, Gene Austin, and Robert Clarac were at the Austins' catering shop next door to Joe's Pharmacy.  They heard a loud bang and went outside to investigate, thinking that the noise came from someone hitting a car in the parking lot.  Kathleen Austin and Robert Clarac testified that they noticed an old dark brown car running its engine.  Kathleen and Robert headed back towards the front of her store and almost collided with a man running around the corner from Joe's Pharmacy.  They described the man as a thin, scraggly-looking white male, approximately six feet tall.  Upon seeing Kathleen, the man slowed to a walk and bid her "Have a nice day."  Kathleen noticed that he was concealing his left hand under his shirt and carrying about three brown bottles in his right hand.

Gene Austin described seeing the same man and car.  He also saw a driver waiting behind the wheel of the car and saw the scraggly-looking man get in the passenger seat of the car.  Gene further  testified that he saw the car drive off in a westerly direction and that he tried to follow the car but was too late.

Authorities apprehended James Roy Knox in 1984 and charged him with the Joe's Pharmacy robbery and murder. Knox's cellmate in the Galveston County jail, Carroll Bernard Smith, testified that Knox admitted to him that he robbed a drug store in Galveston. According to Smith, Knox told him that he attempted to tie-up the pharmacist but had to shoot him when he resisted. Smith further testified that Knox told him that he buried the gun halfway between Galveston and Houston and that after the robbery he headed to Houston where he "did another job." Additionally, Smith stated that he helped Knox shave his head in order to stymie Knox's impending police line-up.

At trial, the State introduced the testimony of a number of Knox's accomplices. George Holland, the admitted getaway driver, testified that in October 1982, he and Knox discussed robbing a certain drug store in Galveston. According to Holland, Knox stated that the robbery would be "a piece of cake" because the pharmacy did not employ any security cameras. Holland also testified that he had seen Knox with a small, dark grey .38-caliber semiautomatic pistol.

According to Holland, he and Knox began to make concrete plans for the robbery in November 1992. In November, Holland and Knox, along with two other friends, drove up to Galveston to see if the pharmacy had installed security cameras. After learning that the pharmacy had not upgraded its security, the foursome went to drink

beer and discuss plans. As Holland testified, Knox explained that he would rob the store employees and Holland would drive the car. The four then returned to Houston.

Holland testified that the next day, he and Knox again drove to Galveston. Once the sun went down, the two men drove to the pharmacy. Holland explained that he waited out in the back parking lot while Knox went inside. Holland testified that Knox returned to the car, got on the floorboard, and instructed Holland to get out of Galveston. Holland stated that he noticed people coming around the side of the building as he and Knox pulled out of the parking lot. He also observed three brown pill bottles in Knox's hands. As they were leaving, Knox explained that, "The man got ignorant with me so I had to shoot him." When Holland asked, "how bad," Knox responded that he had killed the man. Holland told Knox to get out of his car and called Gary Morgan to pick up Knox and take him to a bus station. Holland then left for Alabama.

Gary Morgan testified that he too planned the robbery with Knox and that he and his wife accompanied Knox and Holland to Galveston in order to reconnoiter Joe's Pharmacy. Morgan further stated that he picked up Knox after receiving Holland's phone call. He testified that Knox had some small brown pill bottles with him, which they hid in Holland's car. Morgan also testified that Knox told him that he had used his gun while committing the robbery and explained that Knox shot the man after he refused to be taped and

apparently reached towards his back pocket. Knox also admitted that he got the drugs from the pharmacist's assistant. Morgan testified that Knox gave him some of the cash and pills from the robbery.

Robert Clark, another of Knox's friends in Alabama, testified that Knox discussed robbing a drug store in Galveston. Knox explained to Clark that he could easily rob the pharmacy and obtain cash and Class A narcotics. At the time, Clark knew that Knox carried a .38-caliber semiautomatic pistol.

According to Clark, Knox returned approximately one week later and told Clark that he had robbed the pharmacy in Galveston. Knox explained that he tried to tie up an employee but had to shoot him when the employee reached for his pants pocket. Clark testified that Knox explained Holland's role as the driver and told Clark that they hid the gun at some halfway point. Clark noted that Knox had some Demerol in little brown bottles.

Kathy Pressletz, Knox's former roommate, testified that in the summer of 1981, Knox discussed robbing Joe's Pharmacy in Galveston because it would "be easy to knock off." Pressletz also stated that Knox owned two guns, "a .38 and a .380."

On December 5, 1985, the jury convicted Knox of murder in the course of a robbery, a capital offense under Section 19.03(a)(2) of the Texas Penal Code. The Texas Court of Criminal Appeals affirmed the conviction. The Texas courts later denied Knox's state habeas

petition.

Knox filed a federal habeas petition in the U.S. District Court for the Southern District of Texas. The district court denied the petition but a panel of this Court, on April 19, 1991, reversed and remanded the case "with directions to grant the writ of habeas corpus, unless the State of Texas conducts a new penalty phase within a reasonable time." Knox v. Collins, 928 F.2d 657, 662 (5th Cir. 1991).

On November 8, 1991, Knox filed a motion asking the district court to grant his habeas relief because the state had not yet retried him. The State responded that it was waiting for the district court to set "a reasonable time" for the retrial to begin. The district court held that this Court's order was self-enforcing and did not require an additional order from the district court. On February 26, 1992, the court issued an order denying Knox's request for habeas relief and requiring the State to begin retrial within ninety days, which the State did.

On June 22, 1994, a Texas jury again convicted Knox and the court again assessed the death penalty pursuant to the jury's answers to the special issues. The Court of Criminal Appeals affirmed. Knox v. State, 934 S.W.2d 678 (Tex. Crim. App. 1996). On June 30, 1997, Knox filed an application with the state court for writ of habeas corpus. The trial court conducted an evidentiary hearing and denied the application. The Court of

Criminal Appeals affirmed the denial.

In February 1999, Knox sought habeas relief in the United States District Court for the Southern District of Texas. The district court denied the petition and Knox filed the instant appeal. The district court granted a Certificate of Appealability on the issues raised.

II

This petition, filed after April 24, 1996, is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. Under the AEDPA, we may not issue a writ of habeas corpus with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the State court's adjudication of the claim resulted in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court . . . ; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As the Supreme Court has recently explained, a decision is contrary to clearly established Federal law "if the state court arrives at a conclusion opposite to that reached [by the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, —

U.S.— , 120 S.Ct. 1495, 1523 (2000).  We may issue a writ based on the State Court's unreasonable application of Federal law only "if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case."  Id.  We presume state court factual findings to be correct and will defer to these findings "unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" Chambers v. Johnson, 218 F.3d 360, 363 (5th Cir. 2000)(quoting 28 U.S.C. § 2254(d)(2)).

III

Knox contends that the district court erred in granting summary judgment against his six constitutional claims: that the trial court denied him his Sixth Amendment right to a speedy trial; that the State violated the Fourteenth Amendment by using false evidence against him at both the guilt and the punishment phases of his trial; that the State violated the Eighth Amendment by using inherently unreliable evidence against him at both phases of his trial; that his counsel's deficient performance denied him his Sixth Amendment right to effective assistance of counsel; that the State court violated the Sixth Amendment by excusing a prospective juror on an impermissibly broad basis; and that the State violated the Fourteenth Amendment by failing to disclose that it reached an informal plea agreement with Carroll Bernard Smith in exchange for

Smith's testimony.

A

Knox argues that the state trial court denied him his Sixth Amendment right to a speedy trial. As Knox notes, the trial court did not order a new trial until it received the federal district court's February 26, 1992 order requiring the state court to commence trial within 90 days, eleven months after the Fifth Circuit's March 28, 1991 order of remand for a new trial. Knox contends that this eleven month delay was unreasonable, was attributable to the state, and prejudiced his ability to defend himself at trial and at sentencing. According to Knox, the delay made it impossible for Marion Wilson, an alibi witness and sentencing mitigation witness, to testify. Knox states that Wilson could not testify at the second trial because at the time he was at a Maryland hospital receiving treatment for a blood disorder. According to Knox, "[h]ad the trial occurred eleven months earlier, Wilson would have been available to testify." He suggests that Wilson would have testified that Knox was working on a Motel 6 construction job in Richmond, Virginia on the date of the murders.

In <u>Barker v. Wingo</u>, 407 U.S. 514 (1972), the Supreme Court established a four-part balancing test for determining whether a defendant received a speedy trial within the meaning of the Sixth Amendment. Under <u>Barker</u>, a court must consider: (1) the length of the delay; (2) whether the defendant asserted his right; (3) the

reason for the delay; and (4) the prejudice to the defendant.  <u>Id</u>. at 530.  As a threshold inquiry, the petitioner must demonstrate that the length of the delay is presumptively prejudicial.  407 U.S. at 530.  "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."  <u>Id</u>.

Knox has failed to demonstrate that he has suffered an unreasonable delay.  This Court has previously held that a delay of ten and one-half months is not presumptively prejudicial.  <u>See</u> <u>United States v. Maizumi</u>, 526 F.2d 848, 851 (5th Cir. 1976).  And while neither <u>Barker</u> nor the Constitution itself defines when a delay becomes presumptively unreasonable, we have held  that "[a] delay of less than one year will rarely qualify as 'presumptively prejudicial' for purposes of triggering the <u>Barker</u> inquiry." <u>Cowart v. Hargett</u>, 16 F.3d 642, 646 (5th Cir. 1994).  As we explained, "[a]bsent extreme prejudice or a showing of willfulness by the prosecution to delay the trial in order to hamper the defense, a delay of less than one year is not sufficient to trigger an examination of the <u>Barker</u> factors."  <u>Id</u>. at 647. (internal citations omitted).

Nothing in Knox's petition or elsewhere in the record suggests that the State willfully delayed Knox's trial in order to hamper his defense.   Nor has Knox demonstrated "extreme prejudice." Although the delay may have prevented Knox from putting Marion

-11-

Wilson on the stand, the record establishes that Wilson could not have supplied an alibi defense. As the state notes, Wilson submitted conflicting affidavits, one that provided an alibi for Knox and another that explained that he could not recall whether Knox was actually working for him at the time in question. Moreover, the testimony of other witnesses disproved the possibility of Knox's alibi, placed Knox in the Galveston area at the time of the murder, and stated that Knox committed the offense. In fact, the State presented an affidavit from the vice-president of Motel 6 stating that construction on the Richmond, Virginia Motel 6 did not occur until October 10, 1983, almost one year after the Joe's Pharmacy robbery and murder. Under such circumstances, Knox's inability to present Wilson's testimony does not constitute extreme prejudice. As such, the district court did not err in granting summary judgment on Knox's Sixth Amendment speedy trial claim.

B

The Due Process Clause of the Fourteenth Amendment forbids the State from knowingly using perjured testimony. Giglio v. United States, 405 U.S. 150, 153 (1972). In order to prove that the State has violated the Fourteenth Amendment by relying on such testimony, the defendant must demonstrate: (1) that a witness for the State testified falsely; (2) that such testimony was material; and (3) that the prosecution knew that the testimony was false. Id. at

-12-

153-54.

Knox argues that the State violated the Fourteenth Amendment by permitting Knox's ex-roommate, Kathy Pressletz to testify. He contends that at the first trial, Pressletz lied about four facts during her testimony: that she had worked as a waitress at a bar named "Snuffy's," that her father was named "James Russell," that her father owned the building in which the bar was located, that Knox had cut her with a knife, sending her to the emergency room at John Sealy Hospital, and that she did not begin using drugs until she met Knox. Although Pressletz abandoned the knife story at the second trial, she reiterated her statements concerning her drug use, her father, and her employment at Snuffy's. Knox does not suggest that Pressletz's statements regarding her father and Snuffy's affected the outcome of his trial, but simply that these lies demonstrated that Pressletz is a liar and should not have testified. He concludes that because Pressletz's testimony played an instrumental role in corroborating the testimony of other witnesses, "it undoubtedly played a large role in the jury's deliberations at the guilt phase" and thus renders their verdict untrustworthy.

Although Pressletz may have either lied or mistakenly testified about the knife wound, her father, and her employment at Snuffy's, Knox has not presented any evidence that the State knew that Pressletz's testimony was false. Indeed, the state habeas

court found that the State did not offer "false or perjured testimony during the trial of [Knox] and that "the State did not present any testimony from Kathy Pressletz at the trial which it had good reason to believe would be false." Because these findings are reasonable "in light of the evidence presented in the state court proceeding," we must defer to the state court's determinations. See Chambers v. Johnson, 218 F.3d 360, 363; 28 U.S.C. § 2254(d)(2).

Further, even assuming *arguendo* that the State knowingly submitted perjured testimony, Knox has failed to demonstrate that Pressletz lied about any material fact. Even if Pressletz lied about her father and her employment – neither of which had any bearing on Knox's participation in the murder – a number of other witnesses corroborated her relevant testimony – i.e. that Knox often drove by Joe's pharmacy, that he mentioned that it would be "easy to knock off" the pharamacy, that he possessed handguns with the type of ammunition found at the scene of the crime, and that he threatened to kill her after she testified against him in a prior hearing. As the Supreme Court explained in Giglio, a constitutional violation occurs only where "the false testimony could in any reasonable likelihood have affected the judgment of the jury." Id. at 154. As such, the district court did not err in granting summary judgment against Knox's Fourteenth Amendment claim that the State used inherently unreliable evidence against

-14-

him at both phases of his trial.

C

Relatedly, Knox argues that, by relying on Pressletz's false testimony, the State also violated the Eighth Amendment's prohibition on cruel or unusual punishment. See Johnson v. Mississippi, 486 U.S. 578 (1988). Because we defer to the state court's determination that Pressletz did not testify falsely, we find this claim to be without merit.

D

Knox alleges that his defense counsel performed so inadequately that his conduct deprived Knox of the Sixth Amendment right to effective assistance of counsel. According to Knox, defense counsel committed the following errors: failure to present an alibi witness, failure to challenge a death-prone juror for cause, failure to impeach a prosecution witness, failure to object to the prosecution's bolstering of critical witnesses; failure to keep out evidence of an extraneous offense; and failure to rebut punishment evidence. Knox insists that, when considered together, these errors rise to the level of constitutionally deficient performance.

In order to prove that his attorney's conduct denied him his Sixth Amendment right to effective assistance of counsel, Knox must show both that his counsel's representation fell below professional norms and that the deficient performance prejudiced

-15-

the defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984).
Our review of counsel's performance is "highly deferential."  Id.
at 689.  As the Supreme Court has explained, "[a] fair assessment
of attorney performance requires that every effort be made to
eliminate the distorting effects of hindsight, to reconstruct the
circumstances of counsel's challenged conduct, and to evaluate the
conduct from the counsel's perspective at the time."  Id.  Thus,
"the defendant must overcome the presumption that, under the
circumstances, the challenged action might be considered sound
strategy."  Id. (internal quotations omitted).  Even a deficient
performance does not result in prejudice unless that conduct so
undermined the proper functioning of the adversary process that
the trial cannot be relied upon as having produced a just result.
Id. at 687.  The errors alleged by Knox fail to rise to such
levels of either incompetence or prejudice, even when considered
cumulatively.  We will discuss each in turn.

First, Knox argues that his trial counsel performed
ineffectively by failing to secure the presence of alibi witness
Marion Wilson at his trial.  As we discussed earlier, Wilson
provided inconclusive and contradictory testimony at the first
trial and a number of other witnesses persuasively debunked his
"alibi" theory – that Knox was working in Richmond, Virginia
during the Joe's Pharmacy robbery and murder.  Defense counsel's
failure to call Wilson to testify suggests a realistic appraisal

of the implausibility of Wilson's alibi theory, rather than deficient performance.

Second, Knox argues that his counsel performed ineffectively by failing to lodge a for-cause challenge against juror Nancy Allison, whom Knox describes as "a death-prone prospective juror." He notes that Allison's father was murdered in the course of a robbery and that she answered that she would not mitigate a capital sentence and would answer the special questions in a way that ensured a death sentence. Knox concludes that Allison's unwillingness to consider mitigating evidence or to impose a life sentence because of the possibility of parole rendered her excludable for cause. See Morgan v. Illinois, 504 U.S. 719 (1992).

As the State points out, however, Allison also evinced pro-defense views. Allison stated that she would place the burden of proof on the State to prove its case beyond a reasonable doubt and that, as a Christian, she would have difficulty imposing the death penalty. Given these statements, we cannot say that defense counsel's failure to challenge Allison for-cause falls "outside the wide range of professionally competent assistance." See Strickland, 466 U.S. at 690.

Third, Knox argues that defense counsel failed to impeach the testimony of George Holland, Knox's accomplice and get-away driver. According to Knox, defense counsel at Knox's first trial

successfully impeached Holland by presenting Allen Thompson, Holland's cellmate, as a witness. Thompson testified that Holland intended to get a deal for his testimony, that Holland had a visit with a person who gave Holland papers that he described as pertaining to the charges against him.

Knox's argument is without merit. Thompson's testimony in the first trial consisted of little more than speculation and insinuation. Thompson could not testify as to any evidence of a deal other than Holland's vague insinuations and the fact that he received papers after speaking with somebody. At the first trial, Thompson testified that he never saw Holland with a member of the District Attorney's office nor saw any papers indicating that Holland had struck a deal in exchange for his testimony. Moreover, the State correctly points out that Holland testified that he did not receive such a deal. Defense counsel may simply have realized that Thompson's testimony did little to discredit Holland. A decision not to call such a weak rebuttal witness certainly does not amount to a breach of professional judgment and clearly cannot constitute a "breakdown in the adversary process that renders the results unreliable." Id. at 687.

Fourth, Knox argues that defense counsel failed to object to the State's illegal "bolstering" of its four main witnesses – Morgan, Smith, Pressletz, and Holland. Knox's argument is predicated on the State's question to each of the four witnesses about whether

-18-

they testified in the second trial as they did in the first. Knox argues that such bolstering was impermissible because each of the witnesses had a motive to fabricate at the time of the first trial. Under Texas law, such statements are not admissible because they do not constitute relevant rehabilitative evidence. See Former Tex. R. Cr. Evid. 801(e)(1)(B); Haughton v. State, 805 S.W.2d 405 (Tex. Cr. App. 1990). Specifically, Knox contends that both Morgan's and Smith's desire for plea agreements could have led them to fabricate their testimony in the first trial and that Pressletz is an inveterate liar who would have lied at both trials. Knox also points out that the State mistakenly told the jury during closing argument that Holland had testified as to the same facts in both trials although the State made no attempt to bolster his testimony during their redirect examination.

Although the Texas Rules of Criminal Evidence afforded defense counsel an opportunity to object to such bolstering, counsel's failure to do so does not constitute ineffective assistance of counsel. Counsel may well have believed that whether the State's witnesses testified as to the same facts at the first trial was irrelevant and that he would have been able to impugn the witnesses testimony regardless. He may have concluded that the dangers inherent in objecting -- losing the objection or appearing obstructionist to the jury -- outweighed the marginal benefit in preventing the bolstering. Such a calculation was surely the

-19-

defense counsel's to make.  As the Supreme Court explained in Strickland, "[t]here are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 690.

Fifth, Knox argues that defense counsel failed to prevent the admission of extraneous evidence.  According to Knox, defense counsel failed to object to the testimony of Carroll Bernard Smith, Knox's cellmate, that Knox and an accomplice "did a job" after the robbery at Joe's Pharmacy.  Knox contends that counsel should have been aware that Smith would testify as to this "job" because he did so at the first trial.  Counsel's failure to file a motion in limine, Knox contends, exposed Knox to "the danger of being found guilty on the basis of impermissible character-conformity evidence."

Although defense counsel could have objected to this statement, Smith's passing reference to "a job" was unlikely to greatly influence the jury.  The full context of Smith's statement demonstrates that the reference was both cryptic and made in passing:

    Q Did he tell you what he did after he robbed

    the drug store?


    A Yes, he had somebody waiting outside the

car, and from there he had this person take
him to a halfway point where he buried the
gun, and from there he had a second party
waiting to take him to South Houston to which
they done another job down there.

Defense counsel's failure to object to this brief statement may well have reflected the statement's insignificance rather than counsel's incompetence. Regardless, this error simply does not raise a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Lastly, Knox argues that defense counsel failed to present readily available rebuttal evidence that would have undermined Pressletz's testimony at the punishment phase that Knox claimed to have lynched a man in Vidor, Texas. According to Knox, the defense counsel's investigator was prepared to testify that neither Vidor police records nor newspapers mentioned a lynching during the time in question.

As Knox points out, the Texas Rules of Criminal Evidence permit parties to introduce hearsay evidence in order "[t]o prove the absence of a record, report, statement or entry . . ." Rule 803(10). Nevertheless, the State did not introduce this evidence in order to prove that Knox had actually lynched a man, only that

he was the type of dangerous person who would brag about lynching someone. Because the state clearly did not introduce Pressletz's statement in order to prove that Knox actually lynched someone, defense counsel would have accomplished little by introducing evidence that no lynching had been reported in Vidor. Thus, defense counsel's failure to object did not render his representation constitutionally defective. Moreover, even if defense counsel's error was deficient, we cannot say that such an error was likely to alter the result of the proceeding. The jury sentenced Knox not simply on the basis of Pressletz's testimony but upon a wealth of testimony that persuasively portrayed Knox as a dangerous killer, the man responsible for the Joe's Pharmacy robbery and murder.

Knox has failed to demonstrate either that his counsel committed errors "so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment," 466 U.S. at 687, or that his "conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. As such, the district court did not err in entering summary judgment against Knox's Strickland claims.

E

In Witherspoon v. Illinois, 391 U.S. 510 (1968), the Supreme Court held that a State infringes upon a capital defendant's Sixth and Fourteenth Amendment rights when it excuses for cause those

-22-

members of the venire who express conscientious objections to capital punishment. Id. at 521-22. The State may not challenge a juror for cause "based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U.S. 38, 45 (1980).

Knox argues that the State violated the rule of Witherspoon by challenging Regina George, a prospective juror, simply because she expressed conscientious objection to the death penalty. Knox points out that George also stated that she could put aside her personal beliefs and vote for the death penalty if the evidence so required.

The state court found that "the State met its burden to show that prospective juror[] Regina George . . . would have been substantially impaired in [her] ability to honestly answer [the] special issues." This conclusion is supported by the record. When the State asked whether she would be unable "to follow the instructions of the Judge if that require[d] [her] to assess the death penalty," George answered, "Right." Similarly, when asked "Doesn't matter what evidence we put on . . . you will not vote for death no matter what?" George responded, "Right." In light of this evidence, we must defer to the state court's factual findings, see Chambers v. Johnson, 218 F.3d at 363, and conclude

that the state court properly excluded George as a juror.

F

Finally, Knox contends that the State violated the Due Process Clause of the Fourteenth Amendment when the State failed to disclose that it had struck an implicit plea agreement with Carroll Bernard Smith. Knox alleges that Smith, his cellmate, reached an implicit deal with the State and that the State should have both disclosed the deal to Knox and instructed Smith to testify truthfully about the deal. Because Smith provided important corroborating testimony, both as to Knox's role in the murders and his future dangerousness, Knox concludes that he was materially prejudiced by his inability to impeach Smith's testimony. These arguments are without merit.

The Due Process Clause requires that the State disclose any material exculpatory information to the defense. Brady v. Maryland, 373 U.S. 83 (1963). Evidence is material within the meaning of Brady when there is a reasonable probability that the result of the proceeding would have been different. United States v. Bagley, 473 U.S. 667, 682 (1985). The Due Process Clause also forbids the State from knowingly using perjured testimony where there is a reasonable likelihood that such testimony will affect the verdict. Giglio, 405 U.S. at 153-54.

The state court found that the State did not make a deal with Smith in exchange for his testimony, did not fail to disclose an

-24-

offer to Smith, and did not offer false testimony. In fact, the only evidence to support Knox's claim is Smith's statement that although he did not reach an explicit deal with the State, "I guess it's more like a trust thing. I tell them what I knew and hope like heck that when the time came that I did go to court, the would recognize it and they would not so much recognize, but . . . appreciate the help." Smith never testified that the State told him to trust them, only that he unilaterally chose to do so.

The record supports the state court's factual conclusion that the State did not offer a plea agreement to Smith. Smith's statement that he hoped that the State would recognize his assistance does not necessarily demonstrate that the State even subtly offered him a deal. The record reflects a unilateral hope on Smith's part rather than a deal, whether implicit or explicit, between Smith and the State. Moreover, to the extent that this determination also involved a conclusion of law -- that Smith's unilateral action did not amount to a deal, whether implicit or explicit, -- it is well-supported by the law of this Circuit. As we held in <u>Goodwin v. Johnson</u>, 132 F.3d 162, 187 (5th Cir. 1998), "a nebulous expectation of help from the state . . . is not Brady material." <u>See also</u> <u>United States v. Nixon</u>, 881 F.2d 1305, 1311 (5th Cir. 1989)(holding that a witness's impression that the government would help him obtain a pardon in exchange for his testimony in the absence of a "specific promise to help" was not

<u>Brady</u> material).

Because the record supports the state court's factual determinations and because the state court reasonably relied upon the law of this Circuit, we must defer to their conclusions. Thus, the district court did not err in rejecting Knox's Due Process challenge.

IV

For the above reasons, we AFFIRM the judgment of the district court and DENY Knox's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

AFFIRMED.