IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-10268
_____


RANDAL WAYNE HAFDAHL,

Petitioner-Appellant,

versus

GARY L. JOHNSON, Director,
Texas Department of Criminal
Justice, Institutional Division,

Respondent-Appellee.

_____

Appeal from the United States District Court for the
Northern District of Texas
_____


May 15, 2001

Before JOLLY, JONES, and BENAVIDES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In 1986, Randal Wayne Hafdahl was convicted of murder in a Texas state court and sentenced to death for killing a police officer. The conviction and sentence were affirmed on appeal. Hafdahl now seeks federal habeas corpus relief. He contends that his constitutional rights were violated, both in the guilt phase and the punishment phase of his state trial, when the prosecutor

1

knowingly used false testimony of a forensic pathologist and when the state court admitted testimony relating to a prior unadjudicated kidnaping offense.  The district court denied his habeas petition.  We granted a Certificate of Appealability ("COA") and now affirm the district court's judgment.

I

A

Shortly after 4:00 p.m. on November 11, 1985, Randal Wayne Hafdahl shot and killed Sergeant James D. Mitchell, Jr., of the Amarillo, Texas police department.

Hafdahl had been driving across Texas with two friends, Shawn Terry and Daniel Helgren.  Hafdahl, who admits that he had been consuming alcohol and hallucinogenic mushrooms earlier in the day, was driving recklessly and lost control of his car.  The car left the highway, crossed a frontage road, crashed through a wooden fence around a private residence, and eventually came to rest in the backyard.  When the car would not start, Hafdahl took a loaded 9mm pistol from the glove box, hid it under his coat, and attempted to flee.  He testified that he wanted to hide the gun because he knew the police would arrive soon and discover that he was a convicted felon (for possession of a controlled substance) who had stopped reporting to his probation officer.

Sergeant Mitchell was driving home from work when he witnessed the accident.  He was still dressed in his police uniform and was

wearing an unzipped windbreaker with "Amarillo City Police" and a badge insignia emblazoned on it. Hafdahl testified that he first saw Mitchell when the officer entered the backyard through the downed fence. At that point, Hafdahl turned from Mitchell and tried to escape through a gate, which he could not unlatch. Mitchell pursued Hafdahl across the yard and, according to one eyewitness, identified himself as a policeman and ordered Hafdahl to stop. Mitchell apparently had his police revolver drawn, although he never fired a shot. When Mitchell had almost caught up with him, Hafdahl turned and shot Mitchell four times from approximately six feet away.

B

Hafdahl was then indicted for the capital offense of murdering a police officer. Texas law provides that a person commits the offense of capital murder of a peace officer if (1) that person knows that the victim is a peace officer, (2) he intentionally murders the peace officer, and (3) the peace officer is then acting in the lawful discharge of an official duty, such as investigating a traffic accident. See TEX. PENAL CODE ANN. § 19.03(a)(1). The critical issue at trial was whether Hafdahl knew that Mitchell was an officer.

Hafdahl testified that he believed Mitchell was an angry motorist whom Hafdahl had run off the road. Hafdahl contends that, because he was under the influence of drugs and the events took

3

place so quickly, he did not realize Mitchell was a police officer until after he had fired the fatal shots.

As the district court observed, however, the State put on extensive evidence that Hafdahl must have known that Mitchell was an officer. First, a worker who was only 20 to 25 feet from the crime scene, testified that Mitchell identified himself as a police officer as he approached Hafdahl. Numerous witnesses testified that Mitchell was gesturing and yelling at Hafdahl but that they were too far away to hear what he was saying. When asked whether Mitchell had ever identified himself as an officer, Hafdahl replied, "I can't say if he did or he didn't. All I can say is I didn't hear him."

Second, twelve witnesses, most of whom had stopped on the highway, testified that they immediately recognized Mitchell as a police officer because of his uniform. One of Hafdahl's traveling companions, who was still in the car when Mitchell entered the yard, testified that Mitchell's police uniform was plainly visible and he knew Mitchell was an officer "the second I saw him. . . . No doubt in my mind." As noted above, Hafdahl admits that he saw Mitchell when he entered the backyard through the downed fence. The State argued that Hafdahl would have noticed the police uniform and the Amarillo City Police windbreaker.

Third, Hafdahl shot Mitchell at close range and could not have failed to notice Mitchell's uniform. Although the estimates varied

4

somewhat, two ballistics experts from the Federal Bureau of Investigation testified that Hafdahl was no more than six feet from Mitchell when he fired the shots, and one of Hafdahl's companions testified that Hafdahl was approximately three to five feet from Mitchell. Even if one assumed that Hafdahl had not noticed Mitchell's uniform when he entered the yard, the State suggested, Hafdahl surely would have seen the uniform before firing the fatal shots from such close range.

C

To further establish that Hafdahl was close enough to know that Mitchell was an officer, the State called, among others, Ralph Erdmann, a forensic pathologist. The crux of Erdmann's testimony was that (1) Hafdahl shot Mitchell four times with a semiautomatic 9mm pistol; (2) the first two shots were non-fatal wounds to the abdomen and arm; (3) Hafdahl moved closer to Mitchell while firing, although it was not clear how quickly the shots were fired; (4) both the third and fourth shots to the chest were mandatorily fatal; and (5) judging from the gunpowder stippling specks on Mitchell's face, Hafdahl was approximately two and a half feet from Mitchell when the final shot was fired. Erdmann explained to the jury that many of the assumptions underlying his conclusions were drawn from the reports and conclusions of the investigating officers. His testimony often indicated that the autopsy results were "consistent" with the officers' theories.

5

To support its argument that Hafdahl intentionally killed Mitchell, the State put on evidence that Hafdahl had a motive to avoid apprehension. Two Texas officers (one from Rockwall, the other from Grand Prairie) testified that they had arrested Hafdahl on a warrant for aggravated kidnaping and turned the case over to the FBI. During the guilt phase, neither officer testified about the details of the alleged kidnaping. Neither officer purported to know how the FBI had resolved the case. The implication was that Hafdahl might have believed he was a wanted man and, consequently, that he killed Mitchell in order to evade capture.[1]

D

The jury convicted Hafdahl of capital murder on April 4, 1986. During the sentencing phase, the State requested the death penalty and introduced additional evidence as to the three required "special issues": (1) Whether Hafdahl deliberately killed Mitchell; (2) whether Hafdahl's response to Mitchell's provocation, if any,

---

[1]Two points deserve further comment. First, the evidence of the prior kidnaping arrest was not necessary to prove that Hafdahl intended to kill Mitchell. The State offered the kidnaping testimony for the sole purpose of providing a motive for the crime. Although a motive to commit a crime is relevant to the question of intent, these concepts should not be confused: "Whereas motive is the inducement to do some act, intent is the mental resolution or determination to do it." BLACK'S LAW DICTIONARY 813 (7th ed. 1999).

Second, the State presented other evidence of motive beside the kidnaping arrest. As noted above, Hafdahl admitted that, as a convicted felon, he did not want to be found in possession of a weapon. More relevant, perhaps, is the testimony of Hafdahl's companion, Daniel Helgren, who stated that Hafdahl, in the days before the murder, had admitted to recently jumping bond in Dallas, had begun to use a new alias ("Jack Douglas Cone"), and had dyed his hair.

6

was unreasonable; and (3) whether Hafdahl would probably commit criminal acts of violence in the future. Erdmann was not called to testify further, but the police officers testified in more detail about the kidnaping arrest. The jury then sentenced Hafdahl to death on April 7, 1986.

E

The Texas Court of Criminal Appeals affirmed his conviction in 1990. See Hafdahl v. State, 805 S.W.2d 396 (Tex. Ct. Crim. App. 1990)(en banc), cert. denied, 500 U.S. 948, 111 S.Ct. 2250, 114 L.Ed.2d 491 (1991). Hafdahl instituted state habeas proceedings in 1991, but the Texas Court of Criminal Appeals ultimately denied relief in 1995.

In May 1995, prior to the effective date of the Antiterrorism and Effective Death Penalty Act, Hafdahl filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Texas. After limited discovery was had and the petition was amended, the district court thoroughly and carefully considered all eighty-four points of error raised by Hafdahl. The district court concluded that Hafdahl was not entitled to federal habeas relief and denied the petition in December 1999.

This court granted a COA on August 23, 2000, to determine whether Hafdahl's rights were violated -- at either the guilt phase of the trial or at sentencing -- because of (1) Dr. Erdmann's

allegedly false testimony or (2) the admission of evidence related to a prior unadjudicated kidnaping offense.  We now affirm the judgment of the district court.

## II

Hafdahl contends that the State knowingly used false testimony from Dr. Erdmann and thereby denied him due process of law, both at the guilt phase of the trial and at sentencing.

### A

The Due Process Clause of the Fourteenth Amendment forbids the State knowingly to use, or fail to correct, perjured testimony. See Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); Napue v. Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178-79, 3 L.Ed.2d 1217 (1959).  To prove that the State has denied him due process of law by relying on perjurious testimony, Hafdahl must prove that (1) a witness for the State testified falsely; (2) the State knew the testimony was false; and (3) such testimony was material.  Knox v. Johnson, 224 F.3d 470, 477 (5th Cir. 2000).  Whether the prosecutor knowingly used false and material testimony is a mixed question of law and fact, and we therefore review the district court's factual findings for clear error and the conclusions drawn from those facts de novo.  Creel v. Johnson, 162 F.3d 385, 391 (5th Cir. 1998).

### B

Hafdahl focuses on ten fairly specific statements that Erdmann

8

made at trial. Erdmann testified, to a reasonable medical certainty, that (1) he believed he had determined the sequence of shots; (2) the first shot hit Mitchell's left arm and passed through to his abdomen; (3) the damage to his arm prevented Mitchell from firing his weapon (Mitchell was evidently left-handed); (4) Mitchell's gun was thrown from his left hand to the right side of his body; (5) the second shot was a non-fatal wound to the abdomen; (6) both the third and fourth shots were mandatorily fatal wounds to the chest; (7) Hafdahl moved closer to Mitchell as he fired; (8) Mitchell slumped to the ground as the final shots were fired; (9) the third and fourth shots left gunpowder burns (or "stippling" marks) on Mitchell's face; and (10) test firings of Hafdahl's pistol indicated that the last shot was fired from a distance of two and a half feet. Hafdahl contends that each of these ten statements is false.

Hafdahl attempts to prove the falsity of these statements by comparing Erdmann's 1986 trial testimony to his 1996 deposition.[2] According to Hafdahl, Erdmann admitted in 1996 that he could have testified only as to a "possibility" of the sequence of shots; that there was a 30% to 40% probability that Mitchell could have returned fire after being shot in the forearm; that as a forensic pathologist, he could not form an opinion as to whether Hafdahl

---

[2]To a much lesser extent, Hafdahl also relies on Erdmann's report to a police sergeant, admissions made by the State, and affidavits of other forensic pathologists.

9

advanced on Mitchell as he fired or as to how much time elapsed between the shots; and that his opinions as to the gunpowder marks and distance were speculative and unconfirmed.

C

Having carefully reviewed the record, however, we cannot say that Erdmann, in offering his opinion testimony, testified falsely. There are two reasons why Hafdahl's characterization of Erdmann's testimony is not persuasive.

(1)

First, at the beginning of his 1986 trial testimony, Erdmann explained the basis of his opinion testimony. He testified that he had relied heavily on interviews with the investigating officers, FBI ballistics reports, crime scene photographs, and other second-hand sources of information. It is clear that, in many instances, his testimony was that the autopsy results (such as entry and exit angles of the bullets) were consistent with the officers' theory of what had happened. Hafdahl may be justified in complaining that Erdmann's investigation was not sufficiently independent, but, as this court has pointed out, the proper place to challenge Erdmann's investigative methods and the strength of his conclusions is cross-examination -- not on collateral review. See Fuller v. Johnson, 114 F.3d 491, 496-97 (5th Cir. 1997). When Hafdahl's attorney cross-examined Erdmann at trial and asked about the sequence and frequency of shots, Erdmann replied that "the only

10

thing that I can go by is . . . gathering information, obtaining this from the investigating officers" and then determining whether that information is "consistent" with what was discovered during the autopsy.

Again in the 1996 deposition, Erdmann emphasized that he lacked an independent investigative staff and that he had to base his opinions and conclusions on information provided by the investigating officers. During the deposition, when Erdmann admitted that the sequence of shots may have been different and that he could not have formed an opinion on the time that had elapsed between shots, Erdmann was referring only to what he could have known through the autopsy. Erdmann thus agreed that the evidence he had gathered as a pathologist was, at least to some extent, consistent with Hafdahl's reconstruction of what happened during the shooting.

In sum, Erdmann's 1996 deposition does indeed point out the limitations of his investigation. But the mere fact that much of Erdmann's 1986 trial testimony was predicated on conclusions reached by police investigators does not make his opinion testimony false. We think that Hafdahl has failed to establish that either Erdmann or the prosecutor attempted to mislead the jury about the nature of his investigation or the independence of his conclusions.

(2)

There is a second reason why inconsistencies in Erdmann's

11

deposition testimony are not indicative that his trial testimony can be characterized fairly as false. During the 1996 deposition, Erdmann repeatedly told Hafdahl's attorney that he was no longer familiar with the facts of the case. He had testified at the trial more than ten years earlier and had performed numerous autopsies (he claimed to have averaged over 300 per year) until he retired in 1992. He had read over the transcript of his trial testimony the day before his deposition was taken and did not see the autopsy photos and report until the first day of the deposition. He relied heavily on what the attorney represented to him. In sum, our reading of the nearly 700-page deposition portrays a pathologist who was no longer familiar with the facts of a case, who was not cognizant of the substance of his trial testimony, who relied on the factual assertions and hypothetical situations posed by counsel, and who sometimes agreed that Hafdahl's attorney's theory of the case was consistent with the autopsy results. Under these circumstances, the fact that Erdmann's medical opinions in 1996 differed somewhat from his opinions in 1986 (with regard to whether the damage to Mitchell's left arm would have prevented him from returning fire, for example) does not establish false testimony.

We therefore conclude that Hafdahl has failed to demonstrate that Erdmann's trial testimony was false by showing particular inconsistencies with his deposition testimony. For the same reasons discussed above, we also conclude that none of the other

12

evidence cited by Hafdahl suggests that Erdmann's 1986 trial testimony was false.

## D

On a closely related point, Hafdahl argues that the State's reliance on Erdmann's false testimony rendered the sentencing determination unreliable and thus constitutes a violation of the Eighth Amendment's prohibition on cruel or unusual punishment. See Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988). Because we have determined that Hafdahl has failed to show that Erdmann testified falsely, we find Hafdahl's Eighth Amendment claim to be without merit.

## III

Hafdahl also contends that his constitutional rights were violated when the State was allowed to introduce evidence related to a kidnaping arrest in 1982. Because different evidence was presented during the guilt phase and the punishment phase, we consider the arguments related to each phase separately.

## A

During the guilt phase of the trial, the State sought to introduce evidence of a prior unadjudicated, unindicted kidnaping offense in order to show that Hafdahl had a motive for avoiding arrest and shooting a police officer. Hafdahl objected that such testimony was inadmissible as evidence of bad character. The state court then heard testimony outside the presence of the jury and

13

concluded that, under Texas law, certain portions of this "extraneous offense" testimony could be presented to the jury for the limited purpose of showing that Hafdahl had motive and intent to elude Officer Mitchell.

When the jury was seated again, the State called two Texas police officers: Steven Craighead from Rockwall and Harold Rhodes from Grand Prairie. The officers testified that they had arrested Hafdahl in 1982 on a warrant for aggravated kidnaping and then released him pending an investigation by the FBI. The court did not allow the officers to testify as to the details of the alleged kidnaping.[3] The Texas Court of Criminal Appeals succinctly explained the purpose and nature of the officers' testimony.

> The evidence of [Hafdahl's] arrest for aggravated kidnaping was introduced to show the motive appellant would have to shoot at the officer. Because appellant wanted to avoid apprehension by State authorities, which could produce a subsequent investigation and/or prosecution of the aggravating kidnaping charges, he would more likely than not shoot at the officer knowing him to be an officer.
> The existence of a *potential* for further investigation, along with the *potential* that federal or State aggravated kidnaping charges could occur, is the reason the evidence was introduced. The important factor is appellant's awareness of this potential along with his fear of apprehension.

Hafdahl, 805 S.W.2d at 398 (citations omitted).

Hafdahl argues that this testimony violated his constitutional

---

[3]Outside the presence of the jury, the prosecutor stipulated that Hafdahl was never indicted for the kidnaping charge. Also outside the presence of the jury, the officers said that state kidnaping charges could still be filed.

14

rights for three reasons.

(1)

First, he contends that the State denied him due process of law by knowingly presenting false and material testimony related to the kidnaping arrest. See Knox, 224 F.3d at 477. Hafdahl contends that the officers testified falsely because (1) the officers and prosecutor knew that Laneda Simpson, the alleged victim, had charged that two men (neither of whom was Hafdahl) abducted her from her place of employment and carried her across state lines; (2) outside the presence of the jury, when the court was considering the admissibility of the kidnaping charges to establish motive, the officers suggested to the court that Hafdahl would have been indicted on federal kidnaping charges if he had been found, even though they possessed the FBI's "rap sheet" on Hafdahl that did not even mention the Simpson kidnaping arrest; and (3) outside the presence of the jury, in an effort to tie the kidnaping charges to the motive for the murder, the officers testified that state kidnaping charges might still be brought against Hafdahl, even though the officers and prosecutors presumably knew that the statute of limitations had run on the charges.

However, the first two statements cannot be fairly characterized as false. First, although the alleged victim stated that two men abducted her, she also said that a total of nine people took her to Colorado and detained her for several days.

15

Thus, the statement implicates Hafdahl even if it does not specify what acts he might have committed in the course of this detention. The officers testified only that Hafdahl had been arrested because he was alleged to have participated in the kidnaping. The officers did not testify as to the substance of the victim's statement or Hafdahl's involvement during the guilt phase of the trial. Second, as to the FBI's involvement, Officer Rhodes did not suggest that he knew what actions the FBI had taken, could have taken, or would take in the future. He testified only that he turned the investigation and files over to the FBI.

Furthermore, on the record of this case, Officer Rhodes's suggestion (outside the presence of the jury) that state kidnaping charges could still be filed is essentially immaterial to the admissibility of the kidnaping charges. There is no indication that the judge, who understood the legal principles at issue, would have ruled differently without the testimony at issue. The question is not Rhodes's state of mind -- the question is Hafdahl's state of mind, and there is no indication that he thought the statute of limitations had run. As the state judge explained, the important factor was whether Hafdahl might have thought that charges could have been filed and that he feared possible prosecution. The point was that there was a basis for this fear because Hafdahl knew that he had been arrested three years before under a different name and that the crime had been investigated by

16

the FBI. Thus, even if we assume that both Officer Rhodes and the prosecutor knew that the limitations period had run (and there is no clear evidence that they did), there is no reasonable likelihood that Rhodes's testimony on this point could have affected the jury's verdict inasmuch as it was not material to the admissibility of the kidnaping charge. See Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993)(holding that a conviction will be set aside only if there is a "'reasonable likelihood that the false testimony could have affected the jury's verdict'")(quoting United States v. Bagley, 473 U.S. 667, 679 n.9, 105 S.Ct. 3375, 3382, 87 L.Ed.2d 481 (1985)).

(2)

Second, Hafdahl contends that the State denied him due process of law because the State did not make a showing strong enough that Hafdahl had actually committed the offense of kidnaping to allow its admission as an extraneous offense to show motive for avoiding capture; Hafdahl argues, in other words, that the prejudice greatly outweighed the probative value of this evidence. See Story v. Collins, 920 F.2d 1247, 1254 (5th Cir. 1991). If evidence of an extraneous offense is wrongly admitted, however, habeas corpus relief is proper only if the error is of such magnitude that it resulted in "fundamental unfairness." Blankenship v. Estelle, 545 F.2d 510, 516-17 (5th Cir. 1977).

Even if we assume that the victim's unsworn statement,

17

standing alone, does not constitute a sufficiently strong showing that Hafdahl committed the offense of kidnaping, Hafdahl has not shown any "fundamental unfairness" in the guilt phase of the trial resulting from the prosecutor's presenting this testimony. As we have pointed out above, the state introduced the kidnaping testimony for the limited purpose of showing that the fear of arrest might have motivated Hafdahl. Thus, the only evidence presented to the jury during the guilt phase was the mere fact that Hafdahl was arrested and then released. The trial court did not allow the officers to recount the potentially inflammatory details of Simpson's allegation during the guilt phase. Furthermore, the court allowed Hafdahl to present rebuttal evidence that he was not in danger of being prosecuted for kidnaping. Under these circumstances, no fundamental unfairness resulted from the admission of the testimony to show motive.

(3)

Third, Hafdahl contends that the admission of the kidnaping testimony during the guilt phase violated his rights under the Sixth Amendment's Confrontation Clause because he was not able to cross-examine the victim of the alleged kidnaping. But Hafdahl incorrectly characterizes the officers' testimony about the kidnaping as hearsay. That Hafdahl was arrested is not hearsay: Officer Craighead's testimony -- that he had personally taken Hafdahl into custody -- was not hearsay because it was drawn from

18

the witness's personal knowledge.  Cf. FED. R. EVID. 801(c). Because the officers did not testify about what Simpson (the alleged victim) had told them about the crime, there was no Confrontation Clause violation at the guilt phase of the trial.

B

After a determination of guilt for capital murder, the jury then had to decide punishment.  The kidnaping testimony presents a different question during this phase of the trial.  The State called Officer Harold Rhodes to testify and, after reminding the jury that he had testified in the case several days earlier, Rhodes testified that Hafdahl had a bad reputation for being dangerous and violent.  During direct examination, neither Rhodes nor the prosecutor mentioned the alleged kidnaping.  After the initial cross-examination and further examination by both attorneys, Hafdahl's counsel began asking about Rhodes's investigation of the alleged kidnaping.  Rhodes testified that he had taken Laneda Simpson's statement and arrested Hafdahl and several other men. Hafdahl's attorney then reminded Rhodes that Simpson had a boyfriend in Grand Prairie.  Hafdahl's attorney implied that Simpson voluntarily went to Wyoming with seven men and two women and then, only after she had returned to Texas, had she fabricated the kidnaping story in order to placate her boyfriend.  Hafdahl's attorney asked Rhodes, "[W]hen you got to investigating, after you took her statement, . . . didn't you find out that when she got

19

back down here from two weeks in Wyoming, that she was having trouble explaining to her boyfriend, the guy she had been living with, why it was that all of a sudden she had unexpectedly taken off from a parking lot and gone on a trip to Wyoming for two weeks?" Rhodes denied that his investigation revealed any lying on the part of the victim.

The prosecutor then began further direct examination. Until this point in the sentencing hearing, the jury had heard no testimony whatsoever relating to the facts of the kidnaping allegation. The jury had heard only the attorney's suggestion that the story was fabricated. To get the flavor of this testimony, we reproduce the relevant sections from the further direct examination of Officer Rhodes.

> Q: What did [Simpson] say happened to her?
> A: She said that she had been forcibly taken from a location in Grand Prairie.
>
> Q: By whom?
> A: By the Defendant. . . . And, two other people. That she was forcibly taken out of the State to Colorado, and later to Wyoming for two weeks. And, they returned to the Dallas/Fort Worth area.
>
> Q: Was there any violence noted?
> A: From the time that she was taken from the location in Grand Prairie, she stated that she was beaten. She tried to make an escape from the subjects.
>
> Q: What happened when she tried to make an escape?
> A: She was beaten, gagged, and thrown in a van.
>
> Q: Did she tell you anything else that the Defendant in this case did to her?
> A: She said that if she yelled, that her life would be in danger.

20

On further direct examination and cross-examination, Officer Rhodes testified that state charges were never brought against Hafdahl, that the Grand Prairie police turned over the investigation to the FBI because Simpson alleged that she had been transported across state lines, and that Rhodes never heard from the FBI again about the kidnaping investigation.

Hafdahl contends that Officer Rhodes's testimony during sentencing violated his constitutional rights for three reasons.

(1)

First, Hafdahl argues that he was denied due process of law during the sentencing phase because the State knowingly introduced false and material testimony regarding the kidnaping. See Knox, 224 F.3d at 477.

Hafdahl points to one obvious inconsistency between Officer Rhodes's testimony and Laneda Simpson's statement (upon which Rhodes presumably based his testimony). In her statement, Simpson stated that two men named "Mike" and "Robert" grabbed her in a parking lot, put her in a van, and took her to Colorado and Wyoming. Among the seven men and two women who were traveling together was "Robert # 2, . . . AKA Blue Eyes," who was later determined to be Hafdahl. (Hafdahl's alias at the time was "Robert Eugene Moore.")

It is undeniable, then, that Officer Rhodes was incorrect when he said that three men, including Hafdahl, were alleged forcibly to

21

have taken the victim from her place of employment. Assuming that Rhodes testified falsely by suggesting that Hafdahl was the principal wrongdoer, Hafdahl has not shown how this inaccurate testimony had a material effect on the jury's verdict. See Kirkpatrick, 992 F.2d at 497.

The State presented considerable evidence, in addition to the kidnaping testimony, during the sentencing phase in order to show Hafdahl's propensity for violence and the likelihood of future dangerousness. First, several officers testified as to Hafdahl's bad reputation for violence. Second, an officer testified that he had arrested Hafdahl in 1980 for carrying a concealed weapon, but the charge was dismissed when Hafdahl could not be found. Third, an officer testified that he had arrested Hafdahl for felony theft charges involving stolen weapons. Fourth, an officer testified that Hafdahl was the "enforcer" of a large Colorado-based drug trafficking ring and was also involved in trafficking stolen guns. Fifth, Shawn Terry, one of Hafdahl's companions, testified that Hafdahl was the "overseer" of the drug trafficking operation and occasionally sold the drugs himself. According to Terry, Hafdahl's primary responsibility was collecting debts owed for drugs, and, for this reason, Hafdahl carried a 9mm pistol in his possession "almost all the time; if it wasn't on him, it was somewhere near." Finally, although it was not alleged that Hafdahl personally forced Simpson into the van, Hafdahl was alleged to have helped detain her

for two weeks -- evidence that is clearly relevant to the issue of future dangerousness.

Therefore, in the light of all the evidence presented at sentencing, we cannot say that the officer's testimony that Hafdahl allegedly was one of three men who actually abducted the victim had a material effect on the jury's decision to impose the death penalty.

(2)

Second, Hafdahl argues that Officer Rhodes's false testimony about the kidnaping undermines the reliability of the death sentence in this case and thus constitutes a violation of the Eighth Amendment's prohibition on cruel or unusual punishment. See Johnson, 486 U.S. at 578. This argument assumes, of course, that the officer's statements are false and that the false testimony had a material effect on the jury's decision to impose the death penalty. The analysis is essentially the same as in the Due Process argument above, and we therefore find this argument to be without merit.

(3)

Third, Hafdahl argues that he was denied the opportunity to cross-examine Laneda Simpson, the alleged kidnaping victim, and that his Sixth Amendment right to confront witnesses against him was violated. Hafdahl correctly points out that Officer Rhodes's testimony as to the content of Simpson's unsworn statement is

23

inadmissible hearsay.

However, the mere occurrence of an evidentiary violation is not sufficient to establish a Sixth Amendment violation because, as the Supreme Court has explained, the Confrontation Clause and the hearsay rule are overlapping but not coextensive. Ohio v. Roberts, 448 U.S. 56, 62-65, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Consequently, the admission of an out-of-court statement can pass constitutional scrutiny if the declarant is unavailable[4] and the statement is shown to be reliable. Idaho v. Wright, 497 U.S. 805, 814-15, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). To prove that an out-of-court statement is reliable, the State must show that it either falls within a firmly rooted hearsay exception or has other such "particularized guarantees of trustworthiness" that adversarial testing would add little to its reliability. Id. at 815, 821, 110 S.Ct. 3139.

We may assume without deciding that Simpson's unsworn statement does not meet this standard of reliability. Nevertheless, violations of the Confrontation Clause are still subject to harmless error analysis. See United States v. Landerman, 109 F.3d 1053, 1064 (5th Cir. 1997)(citing Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). In this case, the question is whether the court's error in allowing

_____

[4]The prosecutor explained that Simpson could not attend Hafdahl's trial because complications from her pregnancy prevented her from traveling. Hafdahl does not contest this point.

24

Rhodes to testify as to the content of Simpson's statement was harmless beyond a reasonable doubt. <u>Id.</u>  To determine whether the error was harmless, we consider "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case."  <u>Id.</u>

The prosecution made a strong case for Hafdahl's future dangerousness during the sentencing phase.  As noted above, there was persuasive testimony about Hafdahl's prior arrests on weapons charges and his role as the gun-carrying "enforcer" of a drug trafficking ring.  Compared to this testimony, Officer Rhodes's summary of Simpson's statement loses some of its importance in establishing Hafdahl's future dangerousness.  Indeed, the prosecution made only one reference to the Simpson kidnaping during his summation.  Additionally, we must consider that it was Hafdahl's attorney who, on cross-examination, opened the door about the details of the kidnaping when he implied that Rhodes did not find Simpson's account of the kidnaping credible.  To be sure, there is no other evidence corroborating Simpson's account of the kidnaping except for the arresting officers' testimony that Hafdahl was generally known to have a bad reputation for violence.  But considering these foregoing factors, especially the overall

25

strength of the prosecution's case establishing Hafdahl's future dangerousness, we conclude that the alleged violation of the Confrontation Clause constitutes harmless error beyond a reasonable doubt.

## IV

For the reasons set forth above, Hafdahl is not entitled to federal habeas corpus relief.  The district court's judgment denying habeas relief to Randal Wayne Hafdahl is

A F F I R M E D .

26