MULLINS, J.
**3 In this appeal, we must decide whether the habeas court erred in denying the petition for a writ of habeas corpus filed by the petitioner, Mashawn Greene.[1] The two primary issues are whether the habeas court properly determined that the petitioner's due process rights were not violated during the underlying criminal trial when the prosecutor failed: (1) to correct certain allegedly false testimony from one *855 of the state's key witnesses, Markeyse Kelly,[2] and (2) to disclose certain evidence favorable to the petitioner. The third **4 issue, which arose during the habeas trial, is whether the habeas court abused its discretion by denying the petitioner's request for a capias after Kelly failed to comply with a subpoena commanding his attendance at the habeas trial. We conclude that the habeas court properly determined that the state had not violated the petitioner's due process rights and that the habeas court did not abuse its discretion by denying the petitioner's request for a capias. Accordingly, we affirm the judgment of the habeas court.
The jury in the underlying criminal case reasonably could have found the following facts, as set forth in this court's decision in State v. Greene , 274 Conn. 134, 139-40, 874 A.2d 750 (2005), cert. denied, 548 U.S. 926, 126 S.Ct. 2981, 165 L.Ed.2d 988 (2006). "On the evening of October 10, 2001, the [petitioner] purchased the following stolen firearms: a Smith & Wesson Daniels Cobray M-11 nine millimeter submachine gun (Cobray M-11); a Braco Arms .38 caliber pistol; and a Mossberg 500A shotgun. At the same time, the [petitioner] purchased stolen ammunition for the Cobray M-11 consisting of eight full thirty-five round magazines loaded with nine millimeter Luger Subsonic bullets. A Cobray M-11 is a semiautomatic or automatic assault weapon capable of emptying a thirty-five round magazine in [less than] two seconds.
"On October 12, 2001, the [petitioner], Franki Jones ... Kelly, Shaunte Little and Marquis Mitchell learned that individuals from the area of New Haven known as 'the Tre' were planning to 'shoot up' the area of New Haven known as 'West Hills' in retaliation for a shooting that had occurred the night before. The Tre area includes Elm Street and Orchard Street and the West Hills area includes the McConaughy Terrace projects. Rather than wait for the retaliation, the [petitioner], Jones, Kelly, Little and Mitchell decided to 'go through the Tre first.'
**5 "The [petitioner] drove the four men to Jones' house where those who were not armed already retrieved guns and those with lighter colored clothing changed into darker attire. The [petitioner] armed himself with the Cobray M-11. All five men got into Jones' grey Lincoln Town Car and drove to the Tre. After they saw a group of people on the corner of Edgewood Avenue and Orchard Street, Jones parked the car next to a vacant house on Orchard Street. The [petitioner], Jones, Kelly, Little and Mitchell walked to the corner of Orchard Street and Edgewood Avenue, opened fire on the people on the street corner, then ran back to the Lincoln Town Car and fled the scene. Six people were shot and one of the victims died from his wounds." Id.
The petitioner was arrested and charged with various offenses in connection with the shooting. The petitioner elected a jury trial, at which his accomplices, Little, Jones, and Kelly all testified for the state against him. In particular, with respect to his own involvement in the shooting, Kelly testified that he had pleaded guilty to conspiracy to commit assault in the first degree and carrying a pistol without a permit.[3] Kelly further testified **6 *856 that, with respect to his guilty plea to those charges, it was his understanding that he was facing a maximum sentence of twenty-five years in prison, but that he did not know what his ultimate sentence would be. When the prosecutor, Christopher Alexy, asked Kelly if he had "any understanding as to what could happen if you came in here and testified," Kelly replied, "[n]ope."
Then, without any question pending from Alexy, Kelly began to explain the circumstances around a statement that he gave to the police after his arrest in connection with the shooting.[4] Specifically, Kelly testified that, "[w]hen I gave that statement, I ain't make no deal. They were trying to make a deal with my life. When I gave that statement, I ain't make no deals, no lawyer, no nobody, no nothing, just the cop, I ain't got no deal. I ain't got to hear saying anything. I ain't got no deal. I could have sat here. It ain't really matter."
On cross-examination, the petitioner's trial counsel, Paul Carty, further questioned Kelly about his "deal" with the state. Specifically, Carty asked Kelly if he would have spent the rest of his life behind bars had he not worked out a deal to plead to the charges of conspiracy to commit assault in the first degree and carrying a pistol without a permit. Kelly responded, "I don't know nothing about no deals, none. I don't know nothing about no deals." Immediately thereafter, however, Kelly admitted that his lawyer did, in fact, work out a plea agreement with the state. Kelly acknowledged that the terms of that agreement required that he plead guilty to conspiracy to commit assault in the first degree and carrying a pistol without a permit. Kelly further admitted that, even though his purpose in going to Edgewood Avenue on the night of this incident was to commit **7 homicide, his plea agreement did not involve, nor did he plead guilty to, any homicide charges. Finally, Kelly explained that, pursuant to his plea agreement, the maximum sentence he could receive was twenty-five years of imprisonment.
Carty then asked Kelly whether he had been informed that he could be sentenced to as little as one year in prison, which was the mandatory minimum sentence. Kelly responded that he did not know what the actual sentence would be, but that he did not expect that he would receive a sentence of one year. Rather, Kelly worried that he could receive the maximum twenty-five year sentence.
During closing arguments, Carty stated the following to the jury: "[Kelly] claims he is not looking for a deal, but, think about it, he got the best deal of them all. His deal, he didn't even cop to a homicide *857 [charge]. What did he plead to? Conspiracy to commit assault in the first degree and [carrying a] pistol without a permit. He claims not to be expecting anything in exchange for his testimony, but he knows good and well, as a veteran of the criminal justice system, which he told you he was, that he is going to be treated favorably at sentencing time. He knows how the system works. Give us your testimony, we'll take care of you. He didn't want to deal, but he was already treated favorably by not pleading to a homicide ...."
The jury ultimately returned a verdict finding the petitioner guilty of manslaughter in the first degree with a firearm as an accessory in violation of General Statutes §§ 53a-8 (a) and 53a-55a, conspiracy to commit manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-48 (a) and 53a-55a, five counts of assault in the first degree as an accessory in violation of General Statutes §§ 53a-8 (a) and 53a-59 (a) (5), conspiracy to commit assault in the first degree **8 in violation of §§ 53a-48 (a) and 53a-59 (a) (5), and possession of an assault weapon in violation of General Statutes § 53-202c. In addition, the petitioner pleaded guilty to three counts of theft of a firearm in violation of General Statutes § 53a-212 (a). See State v. Greene , supra, 274 Conn. at 136-38, 874 A.2d 750. The trial court rendered judgment in accordance with the jury's verdict and sentenced the petitioner to sixty-five years of imprisonment.
The petitioner appealed from the judgment of conviction to this court. Id. In that appeal, this court reversed the conviction of manslaughter in the first degree with a firearm as an accessory. Id., at 174, 874 A.2d 750. Consequently, this court directed the trial court to modify the judgment to reflect a conviction of manslaughter in the first degree as an accessory in violation of §§ 53a-8 (a) and 53a-55 (a) (1) and to resentence the petitioner accordingly. Id. This court also reversed the judgment of conviction of conspiracy to commit manslaughter in the first degree with a firearm and directed the trial court to render a judgment of acquittal on that charge. Id. Thereafter, the trial court resentenced the petitioner to sixty years of imprisonment. See Greene v. Commissioner of Correction , 123 Conn. App. 121, 126, 2 A.3d 29, cert. denied, 298 Conn. 929, 5 A.3d 489 (2010), cert. denied sub. nom Greene v. Arnone , 563 U.S. 1009, 131 S.Ct. 2925, 179 L.Ed.2d 1248 (2011).
In 2008, the petitioner filed his first petition for a writ of habeas corpus claiming, among other things, that he was denied the effective assistance of counsel in connection with his guilty plea on the three counts of theft of a firearm. The habeas court denied that petition. The petitioner then appealed to the Appellate Court, which ultimately concluded that the petition should have been granted with respect to these counts and, accordingly, reversed in part the judgment of the habeas court. Id., at 136, 2 A.3d 29. Thereafter, the habeas court, Santos, J. , **9 vacated the petitioner's convictions on those three counts.
In 2013, the petitioner filed his second petition for a writ of habeas corpus, which is the subject of the present appeal. That petition alleged, among other things, that the state violated the petitioner's due process rights during his criminal trial by failing to correct false testimony given by Kelly and by failing to disclose evidence favorable to him. See Napue v. Illinois , 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (state's failure to correct false testimony violates due process); see also Brady v. Maryland , 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (suppression by prosecution of evidence favorable to accused violates due process). The habeas court held a trial on his petition.
*858 At the habeas trial, the petitioner presented the transcript of Kelly's sentencing hearing as an exhibit. That transcript indicated that Kelley had pleaded guilty to conspiracy to commit assault in the first degree and carrying a pistol without a permit in connection with the shooting incident. The trial court, Fasano, J. , noted at that hearing that "[t]here was no recommendation at the time of plea, and the understanding is that ... the ultimate sentencing would depend in part on another trial that was to take place in the interim."[5] Alexy, who was also the prosecutor in that proceeding, then stated that, "[s]ince the pleas were entered ... Kelly complied with all the conditions of the plea **10 agreement very satisfactorily. He was instrumental in helping [to] solve a very brutal shooting." Alexy recommended a sentence of ten years imprisonment for the charges to which Kelly had pleaded guilty. Alexy then noted that there were two additional charges pending against Kelly in an unrelated matter and that it was the state's intention to nolle those charges. The trial court imposed the recommended sentence of ten years imprisonment.
At the habeas trial, Alexy testified that the state's plea agreement with Kelly provided that he could receive a maximum penalty of twenty-five years imprisonment for the two charges to which he pleaded guilty. Alexy acknowledged that it was possible that he could have charged Kelly with being an accessory to murder and conspiracy to commit murder. Alexy also acknowledged that, if Kelly had refused to testify at the petitioner's trial, or had testified falsely, Alexy would have recommended a higher sentence than ten years imprisonment. Alexy further testified that, before the criminal trial had commenced, he told Carty the terms of the state's plea agreement with Kelly. In particular, Alexy told Carty that Kelly would be testifying, that Kelly had entered a guilty plea, that "there was no specific plea agreement"[6] and that "any sentence would be determined by Judge Fasano, subsequent to the trial, if, in fact ... Kelly did cooperate and testify at the petitioner's trial."
Alexy also testified about his own recollection of Kelly's testimony at the criminal trial. Specifically, when counsel for the petitioner asked Alexy whether Kelly had "denied that he was receiving any consideration in exchange for his testimony," Alexy responded, "[t]hat's **11 correct." Counsel then asked whether Kelly had testified that "there was not an agreement," and Alexy responded, "[a]n agreement for a specific sentence, correct." When counsel asked whether Alexy believed that Kelly's testimony "fully summarizes the understanding that [Alexy] had with ... Kelly about his testimony," Alexy responded, "Yes, it says right here that there '[wasn't] no understanding [about] what I was getting sentence[d] to,' which is ... absolutely *859 accurate."[7] Counsel then asked Alexy specifically: "Does ... Kelly's testimony accurately [reflect] the understanding that you had with him?" Alexy responded: "To the extent that-yeah. Yeah." Counsel then asked: "What did [Kelly] say about what was going to happen at sentencing?" Alexy responded: "He said he didn't know what he was going to be getting."
The petitioner's attorney at the criminal trial, Carty, also testified at the habeas trial. He explained that Alexy had told him before the criminal trial that all of the petitioner's codefendants, including Kelly, "were going to have their cooperation made known to the court at the sentencing of them on their respective cases." Carty further testified that, even though Kelly did not admit that he was hoping to benefit from his testimony, Carty still argued to the jury that Kelly was expecting to receive some benefit. Carty explained that "it's kind of disingenuous for someone who is looking at a lot of time to say, well, I am not expecting anything. Of course he is expecting something." Carty further testified that it is standard practice for a cooperating codefendant to plead guilty prior to the trial of a codefendant, to testify at trial, and then to be sentenced. Sentencing is **12 delayed in order to ensure that the cooperating codefendant actually testifies.[8]
The habeas court, Oliver J. , found that "Alexy testified credibly that he properly disclosed to the defense that Kelly would testify against the petitioner, that Kelly had entered guilty pleas before trial, that there was no specific sentencing agreement for ... Kelly, and that his cooperation would be made known to the sentencing judge after trial." The court concluded that Kelly's testimony at the petitioner's criminal trial "was not false or misleading. Though not a model of clarity, it sufficiently and accurately describes the ... 'agreement' [between Kelly and the state]." The habeas court stated that it was aware of no authority "that supports the proposition that a cooperating witness must use or agree to certain 'magic words' in describing the nature of the cooperation agreement. As, in this court's experience as the fact-finder, cooperating witnesses come from all walks of life and have various levels of education and proficiency with the English language, this court declines the invitation to require a cooperating witness to use certain words, including: 'consideration,' 'incentive,' 'agreement,' 'understanding' or 'motive.' Reasonabl[y] competent counsel can draw the fact finder's attention to the witness' motive to testify, falsely in some cases, through proper cross-examination and closing argument, as in the instant matter." Accordingly, the habeas court denied the petitioner's second petition for a writ of habeas corpus. Thereafter, the habeas court granted the petitioner's petition for certification to appeal. This appeal followed.
**13 I
We first address the petitioner's claim that the habeas court incorrectly concluded that his due process rights were not violated at his criminal trial when Alexy failed to correct Kelly's testimony. In particular, the petitioner asserts that Kelly and the state had reached an agreement that Kelly's testimony at the petitioner's criminal trial would benefit him-namely, *860 that Kelly would receive leniency at his own sentencing in exchange for testifying against the petitioner. Thus, the petitioner claims, Kelly testified falsely when he stated that he had no "deal" with the state and was expecting nothing in return for his testimony at the petitioner's criminal trial. As a result, the petitioner argues that Alexy had an obligation to correct Kelly's false testimony.[9] **14 The respondent, the Commissioner of Correction, counters that there was no false or misleading testimony to correct. Specifically, the respondent argues that the context surrounding Kelly's testimony makes it clear that, when he testified that he had no "deal," he was not broadly denying that he had received any benefit in exchange for his testimony. Rather, the respondent contends that Kelly's testimony related only to the sentencing component of his agreement with the state, and that Kelly only denied that he knew what specific sentence he would receive or whether he would receive any leniency at all. This, the respondent contends, was not false. We agree with the respondent.
We begin with the standard of review. Whether a prosecutor knowingly presented false or misleading testimony presents a mixed question of law and fact, with the habeas court's factual findings subject to review for clear error and the legal conclusions that the court drew from those facts subject to de novo review. See Hafdahl v. Johnson , 251 F.3d 528, 533 (5th Cir. 2001), cert. denied sub nom. Hafdahl v. Cockrell , 534 U.S. 1047, 122 S.Ct. 629, 151 L.Ed.2d 550 (2001).
"The rules governing our evaluation of a prosecutor's failure to correct false or misleading testimony are derived from those first set forth by the United States Supreme Court in Brady v. Maryland , [supra, 373 U.S. at 86-87, 83 S.Ct. 1194 ], and we begin our consideration of the [petitioner's] claim with a brief review *861 of those principles. In Brady , the court held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process [when] the evidence is material either to guilt or to punishment, irrespective of the good **15 faith or bad faith of the [prosecutor].' Id., at 87, 83 S.Ct. 1194 ; accord State v. Cohane , 193 Conn. 474, 495, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984). The United States Supreme Court also has recognized that '[t]he jury's estimate of the truthfulness and reliability of a ... witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.' Napue v. Illinois , [supra, 360 U.S. at 269, 79 S.Ct. 1173 ]. Accordingly, the Brady rule applies not just to exculpatory evidence, but also to impeachment evidence; e.g., United States v. Bagley , 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ; Giglio v. United States , 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ; which, broadly defined, is evidence 'having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.' " (Footnote omitted.) Adams v. Commissioner of Correction , 309 Conn. 359, 369-70, 71 A.3d 512 (2013).
"[D]ue process is ... offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. Napue v. Illinois , supra, [360 U.S.] at 269, 79 S.Ct. 1173. If a government witness falsely denies having struck a bargain with the state, or substantially mischaracterizes the nature of the inducement, the state is obliged to correct the misconception. Giglio v. United States , supra, [405 U.S. at 153, 92 S.Ct. 763 ]; Napue v. Illinois , supra, at 269-70, 79 S.Ct. 1173. Regardless of the lack of intent to lie on the part of the witness, Giglio and Napue require the prosecutor to apprise the court when he or she knows that the witness is giving testimony that is substantially misleading. United States v. Harris , 498 F.2d 1164, 1169 (3d Cir.), cert. denied sub nom. Young v. United States , 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed. 2d 665 (1974)." (Internal quotation marks omitted.)
**16 State v. Ouellette , 295 Conn. 173, 186, 989 A.2d 1048 (2010) ; see also State v. Satchwell , 244 Conn. 547, 560-61, 710 A.2d 1348 (1998).
Our review of Kelly's testimony during the underlying criminal trial reveals that the petitioner has taken Kelly's testimony about his agreement with the state out of context.[10] We first look to the statements Kelly made during direct examination.
On direct examination, Alexy asked Kelly "what was your understanding of what your sentence would be ?" (Emphasis added.) Kelly responded, "[i]t wasn't no *862 understanding; what I was getting sentenced to ... was just that." Then, after acknowledging that he faced a maximum of twenty-five years of imprisonment, Alexy asked whether Kelly had "any understanding as to what could happen if you came in here and testified?" Kelly responded: "Nope."[11] **17 The petitioner highlights Kelly's answer of "[n]ope" in connection with the question of whether he had any understanding of what could happen if he testified against the petitioner as evidence of false testimony. At first blush, this isolated response by Kelly could appear to be a blanket denial of any deal or agreement whatsoever. Kelly's statement, however, cannot be divorced from the context surrounding it. Indeed, immediately before this testimony, Alexy asked whether Kelly knew what sentence he would receive. In response to that question, Kelly explained that he was looking at a maximum sentence of twenty-five years of imprisonment, but that he did not know what his sentence would be. It only was at that point that Kelly responded "[n]ope" to the question regarding his understanding of what could happen if he came in and testified.
It is clear to us, therefore, that Kelly's claim that he had no understanding of what would happen if he cooperated with the state related to whether he had an understanding of the specific sentence that he expected to receive and was not substantially misleading. This testimony neither denies the existence of Kelly's plea agreement with the state nor mischaracterizes its terms.
The evidence adduced at the habeas trial further bolsters our conclusion that Kelly's testimony on this issue was not substantially misleading. First, Alexy gave testimony-which the habeas court credited-indicating that when he heard Kelly say "[n]ope," and represent that he "had no understanding" of what would happen if he testified, Alexy understood that he was referring to the fact that he did not know what specific sentence he would receive.[12] This is entirely reasonable given the **18 fact that the line of questioning at that juncture related only to Kelly's understanding of the sentence he expected to receive.
Second, the transcript from Kelly's plea hearing, which was introduced as an exhibit at the habeas trial, further demonstrates that there was no agreed upon sentence, only a maximum exposure of twenty-five years of imprisonment. See footnote 5 of this opinion. Indeed, Alexy never asked Kelly whether he expected that his cooperation would be made known to the sentencing judge, and Kelly never testified on that precise issue.[13] Thus, when viewed in the *863 context of the questions that were asked and the responses given, Kelly's testimony on direct examination was not substantially misleading. This conclusion also is consistent with the other evidence at the habeas trial.
To the extent that the petitioner's claim involves statements Kelly made during his cross-examination, those statements also cannot be evaluated in isolation, unconnected to the context in which they were made. Specifically, Carty asked Kelly the following question: "Had you not worked that deal out [to plead to nonhomicide charges, you were] looking at basically spending the rest of your life behind bars." In response to that inquiry, Kelly testified as follows: "I don't know nothing about no deals, none. I don't know nothing about no **19 deals." Carty then sought to clarify this testimony, and asked Kelly directly: "You worked out a plea, right?" Kelly responded: "My lawyer, I guess, I don't know. I know he told me what I was copping out to, and I took it." This testimony was not substantially misleading.
Again, when evaluated in context, specifically with respect to the questions asked, Kelly's statements did not categorically deny any deal with the state. Kelly's response and, more particularly, his clarification demonstrate that he was denying that he had worked out a plea agreement directly with the state himself , but that it was his lawyer who had worked out the deal. To be sure, immediately following his admission that his lawyer worked out a plea deal, Kelly admitted that he did, in fact, plead guilty to nonhomicide charges for his part in the shooting incident, rather than homicide.[14] This obviously was not a denial of any deal with the state or a mischaracterization of his plea agreement.
Finally, at another point during cross-examination, Carty asked Kelly about his expectations regarding his sentence. Kelly responded: "I ain't expecting nothing, but I know that I could do the time." As with Kelly's previous testimony, the petitioner takes these statements out of context in an attempt to claim that Kelly denied receiving any benefit for his testimony.
Just before Kelly made these statements, Carty had asked him if he knew that he could receive a sentence requiring as little as one year of imprisonment. Kelly responded that he was not expecting a sentence of only one year but, rather, was thinking about having to serve the full twenty-five years, and potentially more, given **20 that he had other charges pending. In response this testimony, Carty asked the following: "That's not what are you expecting out of this?" Kelly answered: "I don't know what I'm getting." Carty then stated "that's not what I'm asking you," and repeated his question: "What are you expecting?" Kelly responded: "I ain't expecting nothing, but I know that I could do the time."[15] *864 It is evident that Kelly was responding to questions regarding the length of the sentence he expected to **21 receive, not whether he expected any benefit whatsoever. His response that he could "do the time" further shows that Kelly understood the question to be directed at the sentence he expected to receive. Because there was no agreement with respect to his specific sentence, Kelly's testimony was not substantially misleading.
This testimony, when considered in context, simply does not suggest that Kelly was denying that he had any expectation regarding whether the state would make his cooperation known to the sentencing judge, as the petitioner suggests. We note that Carty never specifically asked Kelly whether he was aware that the state intended to bring his cooperation to the attention of the sentencing court, and Kelly certainly never denied that he had such an expectation.
We further note that the plea agreement had been disclosed to Carty, and he never objected to Kelly's testimony on the ground that it was misleading or inconsistent with the terms of the agreement. Although Carty's failure to object is not dispositive, we conclude that, because he had the full agreement, it is a factor that we may consider when determining whether Kelly's testimony was false or substantially misleading. Cf. State v. Fauci , 282 Conn. 23, 51, 917 A.2d 978 (2007) (defendant's "failure to object [to prosecutor's improper remarks] demonstrates that defense counsel presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial" [internal quotation marks omitted] )." To be sure, given that Carty had the full agreement, his failure to object bolsters our conclusion that Kelly's testimony was not substantially misleading.
In summary, evaluating each of Kelly's various statements regarding his agreement, understanding or expectation in the context in which he made them, we conclude that his testimony was not substantially **22 misleading. His testimony related to his expectations regarding the specific *865 sentence he would receive, and not to the broader question of whether he was receiving any benefit in exchange for his testimony. Indeed, Alexy testified at the habeas trial that his understanding of Kelly's testimony was that he did not expect to receive any particular sentence, and the habeas court found Alexy to be a credible witness. Furthermore, Kelly's testimony made clear that he had received some benefit, namely, that he had pleaded to nonhomicide charges, which carry a significantly reduced sentence.
In addition, the jury was aware that Kelly had not yet been sentenced and that he was exposed to a twenty-five year prison sentence. Finally, at no point did Kelly ever expressly deny that he expected his cooperation to be made known the sentencing judge. As the respondent points out, under these circumstances, it would require "no great leap of logic for the jury to appreciate and, indeed, expect, that Kelly's ... cooperation in the case against the petitioner would be brought to the attention of his sentencing judge, at the very least by his own counsel, if not by the state itself ...." Accordingly, we conclude that the habeas court reasonably determined that Kelly's testimony was not substantially misleading and, therefore, that Alexy had no duty to correct Kelly's testimony.
In support of his claim to the contrary, the petitioner relies on United States v. Bigeleisen , 625 F.2d 203 (8th Cir. 1980). In that case, the defendant and his accomplice, John Paul Moore, sold drugs together. Id., at 205. Moore was arrested and sentenced before the defendant was apprehended. Id. Initially, Moore refused to implicate the defendant. Id. Moore and the defendant agreed that Moore would remain silent so long as the defendant paid Moore $500 every month. Id. When the defendant missed a payment, Moore contacted the government and agreed to testify against the defendant. Id. Moore **23 agreed to testify only on the condition that the government would bring his cooperation to the attention of the sentencing judge and to the United States Parole Commission. Id. The government agreed to do so. Id.
During the defendant's trial, the prosecutor asked Moore whether he had an agreement with the government concerning his cooperation. Id., at 206. Moore replied: " 'No, I do not.' " Id. The prosecutor then asked: " '[I]s there anything that you are supposed to get in relation to testifying?' " Id. Moore replied: " 'No, there is not.' " Id. The United States Court of Appeals for the Eighth Circuit concluded that this testimony was false, and that the prosecutor's failure to correct it violated Napue . Id., at 208.
We conclude that Bigeleisen is distinguishable from the present case. In Bigeleisen , the cooperating witness categorically denied that he was expecting to receive any benefit in exchange for his testimony. Id., at 206. The court concluded that, in light of Moore's complete denial of any benefit, the jury could have concluded that no agreement existed at all. Id., at 208. Thus, the jury could not properly evaluate his credibility.[16] The present **24 case, however, *866 is not one in which there has been a complete denial of any agreement with the state. To the contrary, Kelly admitted that he had pleaded guilty to certain nonhomicide charges, that the maximum sentence was twenty-five years of imprisonment, that he had not yet been sentenced in connection with those charges, and that he did not know what his sentence would be.
Thus, unlike in Bigeleisen , the jury in the present case was made aware that Kelly already had received favorable treatment from the state by being allowed to plead guilty to nonhomicide crimes-after it also had heard that Kelly and his cohorts killed a person after they fired guns into a crowd of people-and that the state was in a position to reward Kelly further at sentencing. Therefore, although Kelly's testimony was, as the habeas court observed, "not a model of clarity," the habeas court reasonably could have concluded that it was neither false nor substantially misleading. Accordingly, we reject the petitioner's claim that his due process rights were violated when Alexy failed to correct Kelly's testimony.
The concurring justices disagree with this analysis and would assume that Kelly's testimony was misleading. They stop short, however, of calling it false or even substantially misleading. The concurring justices also conclude that, when testimony regarding a plea agreement is misleading-but apparently not false or substantially misleading-the prosecutor has no obligation to correct the testimony if the plea agreement was disclosed to the petitioner before the criminal trial. We agree with this conclusion, but not because compliance with Brady excuses the prosecutor's failure to correct "misleading" testimony that is neither false nor substantially misleading. Indeed, the prosecutor has no duty to correct because Giglio and Napue do not apply to merely "misleading" testimony in the first instance.
**25 Rather, those cases require the prosecutor to correct only testimony that is substantially misleading or false. Of course, if there was no prior disclosure of the plea agreement pursuant to Brady , that would be a due process violation in and of itself, regardless of the degree to which the testimony had the potential to mislead the jury.
In this regard, we note that the "substantially misleading" standard appears to have been first adopted in United States v. Harris , supra, 498 F.2d at 1169, in which the United States Court of Appeals for the Third Circuit stated, without citation to authority, that " Giglio and Napue require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading." See also State v. Paradise , 213 Conn. 388, 400, 567 A.2d 1221 (1990) (quoting Harris ), overruled in part on other grounds by State v. Skakel , 276 Conn. 633, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S.Ct. 578, 166 L.Ed.2d 428 (2006). In Harris , the court used the phrase "substantially misleading" to distinguish the situation in which the prosecutor knows that the state witness was committing perjury from the *867 situation in which "it should be obvious to the [g]overnment that the witness' answer, although made in good faith, is untrue ...." (Emphasis added.) United States v. Harris , supra, at 1169. The fact that testimony must be untrue, and not merely misleading, in order for the prosecutor to have an obligation to correct it is borne out by the seminal cases in this area. See, e.g., Giglio v. United States , supra, 405 U.S. at 151-52, 92 S.Ct. 763 (witness testified that no one told him that he would not be prosecuted if he testified for government when government had, in fact, promised him that he would not be prosecuted); Napue v. Illinois , supra, 360 U.S. at 266-67, 79 S.Ct. 1173 (witness testified that state had not promised him any consideration in exchange for testifying when, in fact, prosecutor had promised consideration); **26 Adams v. Commissioner of Correction , supra, 309 Conn. at 363, 71 A.3d 512 (witness testified that he had not been promised any consideration in exchange for his testimony and that he faced maximum sentence of thirty-eight years when, in fact, judge who had accepted his guilty pleas had placed four year limitation on sentence, with possibility of more lenient sentence based on cooperation).[17]
To the extent that the concurring justices believe that Kelly's testimony was substantially misleading, we disagree with that conclusion for the reasons that we have already stated. The small, decontextualized snippets of Kelly's testimony, upon which the petitioner and the concurring justices seize, namely, his denial that he had "any understanding as to what could happen" if he testified, was not substantially misleading or untrue. It certainly was not received that way by Alexy or Carty. Accordingly, we have no reason to believe that the jury would have interpreted the testimony differently and concluded that Kelly, who had admitted firing a gun **27 into a crowd of people, one of whom was killed, and who had pleaded guilty to nonhomicide offenses for which he had not yet been sentenced, expected to receive no benefit in exchange for his testimony.
Nevertheless, in reaching our conclusion in the present case, we are mindful of the difficulties that defendants face when attempting to provide jurors with the information that they need to make a reliable credibility determination regarding the testimony of a cooperating accomplice. We find those difficulties especially acute when the accomplice has pleaded guilty, has not yet been sentenced at the time of the defendant's trial, and has no express agreement with the state as to a specific sentence. Accordingly, to ensure *868 that the jury is accurately and fully informed of the nature of a cooperating witness' plea agreement and any potential benefits that the witness may receive in exchange for his or her testimony, we believe that it is the better practice, although not constitutionally required, for the prosecutor to ask fact-specific, leading questions of a cooperating witness instead of open-ended questions that may evoke incomplete or ambiguous responses. Indeed, the respondent in the present case has acknowledged that "a prosecutor's better, but not constitutionally mandated practice, might be to ask a cooperating witness a fact-specific, leading question that accurately embodies the nature of the agreement between the witness and the state."[18] We therefore urge the state to follow this procedure.[19] Cf. State v. Ouellette , supra, 295 Conn. at 191, 989 A.2d 1048 **28 ("we urge the state to ensure that sentencing recommendations for cooperating witnesses conform to both the letter and the spirit of any plea agreements disclosed at trial").
II
We next address the petitioner's claim that the habeas court improperly determined that the state did not violate his constitutional right to due process by failing to disclose material favorable evidence to him before his criminal trial. More specifically, the petitioner claims that the state knew, and failed to disclose before his trial, that it was going to recommend a sentence for Kelly that was considerably lower than the maximum twenty-five year sentence to which Kelly was exposed.[20] We disagree.
As we have indicated, "[i]n [ Brady v. Maryland , supra, 373 U.S. at 87, 83 S.Ct. 1194 ], the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.... In Strickler v. Greene , [527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ], the United States Supreme Court identified the three essential components of a Brady claim, all of which must be established to warrant a new trial: The evidence at issue must be favorable to **29 the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been sup-pressed by *869 the [s]tate, either [wilfully] or inadvertently; and prejudice must have ensued.... Under the last Brady prong, the prejudice that the defendant suffered as a result of the impropriety must have been material to the case, such that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Internal quotation marks omitted.) State v. Ortiz , 280 Conn. 686, 717, 911 A.2d 1055 (2006). "A plea agreement between the state and a key witness is impeachment evidence falling within the definition of exculpatory evidence contained in Brady ." (Internal quotation marks omitted.) Id.
"The existence of an undisclosed plea agreement is an issue of fact for the determination of the trial court.... Furthermore, the burden is on the defendant to prove the existence of undisclosed exculpatory evidence." (Citation omitted; internal quotation marks omitted.) State v. Floyd , 253 Conn. 700, 737, 756 A.2d 799 (2000). "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record .... [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence." (Internal quotation marks omitted.) Barlow v. Commissioner of Correction , 150 Conn. App. 781, 791, 93 A.3d 165 (2014).
It is well established that a prosecutor's intention to recommend a specific sentence for a cooperating witness is not subject to Brady if the intention has not **30 been disclosed to the witness. See, e.g., Shabazz v. Artuz , 336 F.3d 154, 165 (2d Cir. 2003) ("[t]he government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, provided that it does not promise anything to the witnesses prior to their testimony" [emphasis in original] ); Diaz v. Commissioner of Correction , 174 Conn. App. 776, 798, 166 A.3d 815 ("Any ... understanding or agreement between any state's witness and the state police or the state's attorney clearly falls within the ambit of Brady principles.... An unexpressed intention by the state not to prosecute a witness does not." [Internal quotation marks omitted.] ), cert. denied, 327 Conn. 957, 172 A.3d 204 (2017).
The petitioner in the present case claims that Alexy violated Brady because he knew, and failed to disclose, that he "would ask the sentencing court in Kelly's pending related criminal matter for a specific sentence considerably lower than Kelly's exposure under the open plea ...." The petitioner, however, has cited no evidence whatsoever that would support a finding that Alexy knew before Kelly testified what specific sentence he would recommend. All he has done is point to the fact that Alexy recommended a lower sentence at Kelly's sentencing hearing and ask this court to infer that Alexy knew that he would make such a recommendation and failed to disclose this intention. The fact that Alexy recommended a lower sentence, standing alone, does not establish the existence of a preexisting promise of leniency in exchange for testimony. See Shabazz v. Artuz , supra, 336 F.3d at 165 ("[w]e hold only that the fact that a prosecutor afforded favorable treatment to a government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony") To be sure, if Alexy had no intention to recommend *870 a specific sentence **31 before the petitioner's criminal trial-and there has been no evidence to establish that he had such an intention-he obviously had nothing to disclose to the petitioner.
Moreover, even if Alexy had an unexpressed intention to ask for a specific sentence if Kelly cooperated with the state, the habeas court found that "the nature of the 'agreement' was properly disclosed" to Carty. The habeas court also found that Alexy credibly testified that "there was no specific sentencing agreement for [Kelly] ...." The petitioner has not demonstrated that these findings are clearly erroneous. Accordingly, we conclude that the petitioner has failed to establish the necessary factual predicate for his claim-namely, that Alexy did, in fact, promise Kelly that he would recommend a specific sentence at Kelly's sentencing hearing considerably lower than his exposure under the plea in exchange for his testimony at trial. We therefore reject this claim.
III
Finally, we address the petitioner's claim that the habeas court abused its discretion when it denied his request to issue a capias for Kelly's arrest during the habeas trial. We disagree.
The following additional facts and procedural history are relevant to our resolution of this claim. At the habeas trial, the petitioner called Erik Eichler, a private investigator, as a witness. Eichler testified that he had been retained by the petitioner's counsel to locate and interview Kelly. Eichler located Kelly and interviewed him in December, 2015. Eichler discussed the interview with the petitioner's counsel, who then instructed Eichler to obtain a written statement from Kelly and to issue a subpoena to him to attend the habeas trial. In February, 2016, Eichler met again with Kelly and presented him with a written statement that Eichler had prepared **32 based on his interview of Kelly. Kelly signed the statement under oath. Eichler also served Kelly with a subpoena directing him to appear at the habeas trial.
Notwithstanding service of the subpoena, Kelly did not appear at the habeas trial as directed. As a result, counsel for the petitioner asked that the habeas court either issue a capias for Kelly's arrest or declare Kelly to be unavailable. The petitioner's counsel argued that Kelly's testimony was necessary because his written statement and his statements during his interview with Eichler indicated that Kelly "was aware that he would receive consideration for favorable testimony at [the] trial of the petitioner." Thereafter, the subpoena was marked as a full exhibit at the habeas trial, but the written statement was marked for identification only.
The habeas court then questioned Eichler about Kelly's unavailability. Eichler testified that he had had no contact with Kelly between the date of his last interview, February 11, 2016, and the date of the habeas trial, February 24, 2016. Eichler tried to call Kelly on the day of trial, but his cell phone was "off." Eichler made no attempt to go to Kelly's home address or to determine whether he was incarcerated or had a court date in another court. The court then questioned Eichler about the details of his interviews of Kelly and the procedure by which he had created the written statement. The court stated on the record that it was not reading Kelly's written statement.
On the basis of the evidence before it, the habeas court concluded that Kelly was not unavailable to testify, but "he [was] simply not [t]here ...." Accordingly, the court denied the petitioner's request to issue a capias to compel Kelly to attend the trial.
*871 The standards governing the issuance of a capias are well established. "If one is not warranted in refusing to honor a subpoena and it is clear to the court that **33 his absence will cause a miscarriage of justice, the court should issue a capias to compel attendance. General Statutes § 52-143[21] does not, however, make it mandatory for the court to issue a capias when a witness under subpoena fails to appear; issuance of a capias is in the discretion of the court. The court has the authority to decline to issue a capias when the circumstances do not justify or require it.... In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Citations omitted; footnote added; internal quotation marks omitted.) DiPalma v. Wiesen , 163 Conn. 293, 298-99, 303 A.2d 709 (1972).
We conclude that the habeas court did not abuse its discretion when it denied the petitioner's request to issue a capias for Kelly's arrest. First, the petitioner presented no evidence that Kelly's failure to comply with the subpoena was not warranted. Second, the court reasonably could have concluded that the petitioner was partially responsible for Kelly's failure to appear because the petitioner made no effort during the two weeks between Eichler's last interview with Kelly and the date of the habeas trial to contact Kelly to ensure that he would be present in court to testify on the petitioner's behalf. Under these circumstances, we cannot **34 say that the habeas court abused its discretion in declining to issue the capias. Accordingly, we reject this claim.
The judgment is affirmed.
In this opinion PALMER, ROBINSON and VERTEFEUILLE, Js., concurred.
D'AURIA, J., with whom McDONALD, J., joins, concurring in the judgment.
Like the majority, I conclude that the petitioner, Mashawn Greene, was not deprived of due process of law as guaranteed by the fifth and fourteenth amendments to the federal constitution. I therefore concur in the judgment affirming the habeas court's denial of the petition for a writ of habeas corpus.
However, I would affirm on the alternative ground advanced by the respondent, the Commissioner of Correction.[1] Specifically, I conclude that the prosecutor in this case discharged his duty under Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed. 2d 1217 (1959), Brady v. Maryland , 373 U.S. 83, 86, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963), and Giglio v. United States , 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed. 2d 104 (1972), by disclosing to the petitioner's criminal trial counsel, prior to the petitioner's criminal trial, the full extent of any agreement or understanding he had with the cooperating witness, Markeyse Kelly. See *872 Beltran v. Cockrell , 294 F.3d 730, 736 (5th Cir. 2002) ("[g]overnment fulfilled its duty of disclosure by supplying [the defendants] with its recollection of the true circumstances of the negotiations with the witness at a time when recall [to the witness stand] and further exploration of these matters was still possible" [internal quotation marks omitted] ); United States v. Decker , 543 F.2d 1102, 1105 (5th Cir. 1976) (same), cert. denied sub nom. **35 Vice v. United States , 431 U.S. 906, 97 S.Ct. 1700, 52 L.Ed. 2d 390 (1977) ; see also State v. Ouellette , 295 Conn. 173, 186, 989 A.2d 1048 (2010) (prerequisite of any Brady , Napue , and Giglio claim is existence of undisclosed agreement or understanding between cooperating witness and state); State v. Floyd , 253 Conn. 700, 736-37, 756 A.2d 799 (2000) (undisclosed, implied plea agreement first predicate to due process claim regarding nondisclosure of agreement); Hines v. Commissioner of Correction , 164 Conn. App. 712, 725, 138 A.3d 430 (2016) ("agreement by a prosecutor with a cooperating witness to bring the witness' cooperation to the attention of the [sentencing] judge ... must be disclosed to the defendant against whom he testifies, even if the deal does not involve a specific recommendation by the prosecutor for the imposition of a particular sentence"). Accordingly, although I agree with parts II and III of the majority opinion, I do not join in part I.
I differ with the majority in that, after "careful review" of Kelly's testimony, with an eye toward "its probable effect on the jury"; Adams v. Commissioner of Correction , 309 Conn. 359, 373, 71 A.3d 512 (2013) ; I cannot conclude that Kelly's answers to the prosecutor's questions on direct examination were not misleading.[2]
However, as both the prosecutor and the petitioner's criminal trial counsel testified at the habeas trial, and as the habeas court found, the petitioner's counsel "was **36 made aware of the ... understanding by [the prosecutor] prior to trial." The petitioner does not contest this finding on appeal. He was therefore able to use this information during cross-examination to attempt to impeach Kelly's credibility. To the extent that he refrained from doing so,[3] or refrained from asking the prosecutor, through the court, to clarify any understanding the witness had with the state, the petitioner also does not challenge those omissions in this appeal. Cf. United States v. Iverson , 648 F.2d 737, 738 and n.5 (D.C. Cir. 1981) (prosecutor has obligation to disclose exculpatory information when "defense counsel, although possibly aware of the relevant information, was unable, as a practical matter, to use it to cast doubt upon contrary evidence proffered by the government or its witnesses").
On this record, I would simply assume Kelly's testimony was misleading, but, then, I would conclude that no due process violation resulted. My choice to make this assumption stems from my concern that, after Kelly's testimony on direct examination, "jurors could well have been left with *873 the impression ... that [he did not have] any incentive to testify favorably for the state." State v. Jordan , 135 Conn. App. 635, 667, 42 A.3d 457 (2012), rev'd in part on other grounds, 314 Conn. 354, 102 A.3d 1 (2014). A review of Kelly's direct examination reveals that he testified only that, after giving a statement implicating the petitioner, he later pleaded guilty to assault in the first degree and carrying a pistol without a permit. The jurors were provided with no **37 context during Kelly's direct examination that allowed them to assess or determine whether he had actually faced greater charges or whether permitting him to plead guilty to only those charges constituted a " 'sweet-heart deal,' " as the respondent refers to it. Nor was there, during Kelly's direct examination, any mention of the understanding, made explicit at Kelly's plea hearing, that "his continued cooperation in the cases of the codefendants [including the petitioner] will be made known to the court at the time of [Kelly's] sentencing ...."
Instead, Kelly answered the prosecutor's first question about his "understanding" by denying, accurately, that there was an agreement concerning what his actual sentence would be. He answered the prosecutor's next question by stating, also accurately, that he was facing a maximum of twenty-five years incarceration on the charges to which he pleaded guilty.[4] The prosecutor then asked, "[a]nd do you have any understanding as to what could happen if you came in here and testified?" Kelly responded, "[n]ope." Unsolicited, Kelly then expounded: "When I gave that statement [to the police implicating the petitioner], I ain't make no deal. They were trying to make a deal with my life. When I gave that statement, I ain't make no deals, no lawyer, no nobody, no nothing, just the cop. I ain't got no deal. I ain't got to hear [anybody] saying anything. I ain't got no deal. I could have sat here. It ain't really matter." The prosecutor then dropped this line of questioning.
**38 The "context"[5] in which this testimony arose was that the prosecutor asked Kelly, his own cooperating witness, whether there was any understanding about his sentence or about "what could happen if *874 you came in here and testified." Cf. United States v. Harris , 498 F.2d 1164, 1169 (3d Cir.) ("[t]his is not to say that the prosecutor must play the role of defense counsel, and ferret out ambiguities in his witness' responses on cross-examination " [emphasis added] ), cert. denied sub nom. Young v. United States , 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed. 2d 665 (1974). As the respondent's counsel admitted candidly in oral argument before this court, the usual purpose for this line of questioning by the prosecution is to "anticipatorily ... take the sting **39 out of" any agreement the state has with a witness or, in other words, to preemptively expose the bias of its own witness. Considering the "probable effect on the jury"; Adams v. Commissioner of Correction , supra, 309 Conn. at 373, 71 A.3d 512 ; Kelly's responsive denials ("no understanding" and "no deal") could well have been interpreted to bolster his credibility rather than to take the "sting" out of any agreement or to preemptively expose his bias. It is doubtful this was the prosecutor's intent,[6] but, the prosecutor, having decided to wade into this area of inquiry, could have led a reasonable jury to understand that Kelly did not "[have] any incentive to testify favorably for the state." State v. Jordan , supra, 135 Conn. App. at 667, 42 A.3d 457.
Because, in my view, there was no undisclosed agreement or understanding in the present case, I conclude that the petitioner's due process rights were not jeopardized. See State v. Ouellette , supra, 295 Conn. at 186, 989 A.2d 1048. As a result, I respectfully concur in the judgment.

The petitioner appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

We note that Kelly's name is spelled in various ways in the record. We use this spelling for the sake of consistency with prior decisions. See State v. Greene , 274 Conn. 134, 139, 874 A.2d 750 (2005), cert. denied, 548 U.S. 926, 126 S.Ct. 2981, 165 L.Ed. 2d 988 (2006).

The transcripts of the petitioner's criminal trial were not introduced as an exhibit in the present case and were not filed as part of the record in this appeal. Portions of the transcript containing Kelly's testimony concerning his plea agreement with the state were reproduced, however, in the petitioner's appendix to his brief. Selected portions of the transcripts also are quoted in the parties' briefs, and neither party challenges the accuracy of the other party's representations. After oral argument, this court ordered the parties to submit supplemental briefs on the question of whether the transcripts were before the habeas court and, if not, whether this court properly could consider them. Thereafter, the parties filed a joint statement indicating that the habeas court took judicial notice of the entire file in a previous habeas action brought by the petitioner; see Greene v. Commissioner of Correction , 123 Conn. App. 121, 123, 2 A.3d 29, cert. denied, 298 Conn. 929, 5 A.3d 489 (2010), cert. denied sub nom. Greene v. Arnone , 563 U.S. 1009, 131 S.Ct. 2925, 179 L.Ed.2d 1248 (2011) ; which included transcripts from the underlying criminal trial. We conclude that, under these circumstances, we may consider these excerpts from the transcripts in the petitioner's underlying trial.

In his statement to the police, Kelly identified the petitioner as being involved in the shooting. He also admitted his own involvement in the shooting.

The transcript of Kelly's plea hearing also was introduced as an exhibit in the underlying habeas proceedings. At that hearing, Alexy, who was also the prosecutor in that proceeding, stated that "[t]here is no agreed sentence .... I believe that [Kelly] understands that his continued cooperation in the cases of the codefendants will be made known to the court at the time of the sentencing and that the ultimate sentence will be up to the court." During its canvass of Kelly, the trial court, Fasano, J. , stated that "[t]he sentencing court, at the time of sentencing, will consider any cooperation and truthful testimony in the cases of the codefendants as an element of consideration in sentencing you."

Although Alexy said there was no specific "plea agreement," the context makes clear that he was referring to the fact that there was no specific sentencing agreement. Indeed, the parties do not dispute that Kelly had entered into a plea agreement with the state.

Alexy was referring to the underlying criminal transcript, which counsel for the petitioner had asked Alexy to read to refresh his recollection of Kelly's testimony.

The petitioner subpoenaed Kelley to testify at the habeas trial. Kelly did not, however, appear. As we explain in part III of this opinion, the habeas court denied the petitioner's corresponding request for a capias directing Kelly's arrest.

The petitioner also contends that the habeas court incorrectly concluded that, because the agreement between the state and Kelly was disclosed to the petitioner before Kelly testified, even if Kelly's testimony was false or misleading, it was the duty of Carty, not Alexy, to make that fact known to the jury. We are not convinced that this is an accurate characterization of the habeas court's decision.
Although the habeas court noted that Kelly's testimony was not a "model of clarity," the court found specifically that Kelly's testimony was not false or misleading. The court made no alternative finding that, if the testimony was false, it was then the petitioner's obligation to correct it. Thus, the decision reasonably can be interpreted as holding only that, when the state has disclosed all the terms of a plea agreement to the defense and a witness' testimony is not a model of clarity, but also is not false or misleading for purposes of governing due process principles, defense counsel can attempt to clarify the testimony through cross-examination.
Consequently, because we conclude that the habeas court properly determined that Kelly's testimony was not false or misleading, we need not address the question of whether a prosecutor has an obligation to correct false or misleading testimony in cases in which the prosecutor has fully and accurately disclosed a plea agreement to defense counsel. Compare Hines v. Commissioner of Correction , 164 Conn. App. 712, 728, 138 A.3d 430 (2016) (state not required under Napue v. Illinois , supra, 360 U.S. at 269, 79 S.Ct. 1173, to correct witness' allegedly perjured testimony regarding agreement with state because agreement was disclosed to petitioner's counsel before criminal trial), with State v. Jordan , 135 Conn. App. 635, 666-67, 42 A.3d 457 (2012) (when prosecutor fully and accurately disclosed cooperation agreements to defendant before trial, prosecutor still had duty to correct witnesses' false testimony denying existence of agreements), rev'd in part on other grounds, 314 Conn. 354, 102 A.3d 1 (2014). We note that this court expressly declined to resolve this issue in Jordan . See State v. Jordan , 314 Conn. 354, 369 n.7, 102 A.3d 1 (2014).

Although the petitioner has cited the transcript pages where he claims Kelly testified falsely, he has not identified the specific statements in Kelly's testimony that he claims were false. Rather, he has simply made the general claim that Kelly's testimony was false because he testified at various points on direct examination and cross-examination that he had no deal, that he had no understanding of what would happen as a result of his testimony and that he was not expecting anything in exchange for his cooperation. Accordingly, we assume for purposes of this opinion that the petitioner is contending that each instance in which Kelly denied having any deal or any understanding of what would happen in his criminal case if he cooperated with the state was false and that the state's obligation to correct that testimony was triggered upon each occurrence. We therefore analyze each instance independently to ascertain whether the testimony was false or substantially misleading and, concomitantly, whether the prosecutor's obligation to correct that testimony arose.

The following colloquy took place between Alexy and Kelly:
"Q. Now, what was your understanding of what your sentence would be?
"A. It wasn't no understanding; what I was getting sentenced to, it was just that.
"Q. Well, what was the maximum that you are looking at?
"A. Twenty-five years.
"Q. And do you have any understanding as to what could happen if you came in here and testified?
"A. Nope."

The concurring justices believe that Alexy's testimony is irrelevant. Although we do not consider Alexy's testimony to be dispositive of whether Kelly's testimony was untrue or substantially misleading, we consider it probative regarding whether Kelly's testimony related to the specific sentence that he would receive. See footnote 5 of the concurring opinion.

Kelly also testified at various points on direct examination and cross-examination about the statement he gave to the police shortly after the shooting. In his explanation, he repeatedly stated that when he gave that statement, he had no deal. This testimony was not false, as there is no evidence whatsoever that Kelly had any deal when he gave his statement to the police. The petitioner does not appear to challenge Kelly's representation that he had no deal at that point in time. It is important, however, in analyzing the petitioner's claims, that we distinguish between Kelly's testimony regarding any deals he had, or did not have, when he gave his statement to the police and his testimony regarding any deal he had with the state related to his plea agreement. Only his testimony regarding his deal with the state relating to his plea agreement is at issue in the present appeal.

The following colloquy took place between Carty and Kelly:
"Q. So, you are not even pleading to a homicide, right?
"A. I don't know.
"Q. Nothing to do with homicide, right?
"A. No."

The following colloquy took place between Carty and Kelly:
"Q. Except [you're] going to be sitting in jail for perhaps a lot less time, isn't that right?
"A. Twenty-five years.
"Q. All right. Well, when you entered your plea, weren't you informed that the minimum time that you could get is as little as one year, the maximum is [twenty-five] years, but there is only one year which is mandatory?
"A. I ain't know nothing about that.
"Q. Well, were you present when you entered your plea?
"A. Yeah, but I ain't know nothing about one year, I know the maximum is [twenty-five] years.
"Q. Were you listening to what the Judge told you?
"A. Whole bunch of things was in my head at the time. I was thinking about the whole [twenty-five] years, I wasn't thinking about no year, I ain't getting no year, I wasn't thinking about one year, I was thinking about the whole [twenty-five years] plus the other charges I got pending. They trying to get me five more for that.
"Q. That's not what you are expecting out of this?
"A. Who me?
"Q. Yeah.
"A. I don't know what I'm getting.
"Q. Well, that's not what I'm asking you. What are you expecting?
"A. I ain't expecting nothing, but I know that I could do the time. I know they can't. They ain't strong enough, they ain't built. I know I could do the time. That up to them if they could do the time, which I know they can't, they weak. If they wasn't weak, they never would have told in the first place....
"Q. Okay, but the time that you are going to be doing is just for an assault, conspiracy to commit an assault.
"A. I guess.
"Q. Right?
"A. I guess.
"Q. Have nothing to do with homicide, correct?
"A. Nope."

In United States v. Bigeleisen , supra, 625 F.2d at 208, the government asserted that Moore's false testimony was inconsequential because the government had disclosed its agreement with Moore in its opening statement. The Eighth Circuit rejected this argument, reasoning as follows: (1) the prosecutor had not explained the entire agreement in the opening statement, namely, that "[t]he government did not mention its undertaking to intercede with the [United States] Parole Commission, and that body will often be able to do an inmate more good than a sentencing judge"; and (2) the opening statement is not evidence. Id. The court concluded that the jury did not have the evidence necessary to evaluate Moore's credibility as a witness. Id. After reaching that conclusion, the court explained that the prosecutor impermissibly capitalized on the witness' false testimony during closing argument and implied that the government had no agreement with the witness. Id. These factors are not an issue in the present case. To the contrary, in the present case, the petitioner makes no claim that the state attempted to capitalize on any ambiguity in Kelly's testimony in his closing argument. Indeed, in the present case, Carty argued to the jury that Kelly had a deal with the state and would receive a benefit in exchange for his testimony at the petitioner's criminal trial. Accordingly, we conclude that the rationale in Bigeleisen is inapplicable to the present case.

Furthermore, we conclude that, given that the rationale underlying Napue and Giglio is that due process is violated if the state obtains a conviction on the basis of false evidence, any expansion of the "false evidence" standard beyond testimony that is, in fact, false, should be undertaken carefully. See People v. Smith , 498 Mich. 466, 489, 870 N.W.2d 299 (2015) (Kelly, J., concurring) (After agreeing with the majority that the defendant was entitled to a new trial because certain testimony from a state's witness was false, Justice Kelly cautioned that "[t]he majority expands the 'false evidence' standard by allowing a new trial on the basis of 'substantially misleading' evidence in the form of testimony. This standard is unworkable [because] it allows a reviewing court to '[pick and choose] small snippets of testimony' to determine the 'overall impression' that those small snippets create. I would simply examine whether the prosecutor knowingly proffered false testimony. By attempting to decipher the 'overall impression' particular snippets of testimony made on the jury, and by potentially requiring prosecutors to correct testimony that might not actually be false, the majority creates an ambiguous standard that will be difficult to apply in practice." [Footnotes omitted.] ); see also United States v. Harris , supra, 498 F.2d at 1169 (rejecting proposition that "the prosecutor must play the role of defense counsel, and ferret out ambiguities in his witness' responses on cross-examination").

The state has previously made the same acknowledgment in at least one other case. See State v. Jordan , Conn. Appellate Court Records & Briefs, January Term, 2012, State's Brief p. 34 n.34 ("a best, but not constitutionally mandated, practice might have been to follow up each response with a fact-specific question that accurately embodied the nature of the state's agreement with the witness").

We recognize that a prosecutor has no duty to inform the jury that a cooperating witness may have a motive to testify favorably for the state, but is obligated only to provide such information to the defendant and to ensure that the witness does not testify falsely. If the prosecutor chooses to present evidence about a plea agreement in order to preempt a potentially damaging cross-examination, however, the prosecutor should endeavor to ensure that the evidence is accurate and complete.

The petitioner also claims that the state failed to disclose its intent to nolle charges in two other, unrelated files. Although the petitioner referred in passing to these nolles in his pretrial brief to the habeas court, the petitioner presented no evidence at the habeas trial as to whether Alexy disclosed the existence of those charges, or their intended disposition, to the petitioner before his criminal trial. Additionally, the habeas court made no findings and issued no ruling with respect to them. Thus, we decline to review any claim relating to these two charges.

General Statutes § 52-143 (e) provides: "If any person summoned by the state, or by the Attorney General or an assistant attorney general, or by any public defender or assistant public defender acting in his official capacity, by a subpoena containing the statement as provided in subsection (d) of this section, or if any other person upon whom a subpoena is served to appear and testify in a cause pending before any court and to whom one day's attendance and fees for traveling to court have been tendered, fails to appear and testify, without reasonable excuse, he shall be fined not more than twenty-five dollars and pay all damages to the party aggrieved; and the court or judge, on proof of the service of a subpoena containing the statement as provided in subsection (d) of this section, or on proof of the service of a subpoena and the tender of such fees, may issue a capias directed to some proper officer to arrest the witness and bring him before the court to testify."

I agree with the majority's recitation of the facts and procedural history.

A case in which a witness has clearly testified falsely or committed perjury, whether on direct or cross-examination, may pose a different due process question, which is not implicated here. See United States v. Sanfilippo , 564 F.2d 176, 178 (5th Cir. 1977) ("[d]ue process is violated when the prosecutor, although not soliciting false evidence from a [g]overnment witness, allows it to stand uncorrected when it appears"); 6 W. LaFave et al., Criminal Procedure (4th Ed. 2015) § 24.3 (d), p. 471 ("[i]f the prosecutor knows or should have known that the [witness'] statement is untrue, it has a duty to correct it").

As the respondent points out in his brief to this court, the petitioner's criminal trial counsel did not specifically ask Kelly about any understanding he had with the state that his cooperation would be made known to the sentencing judge. Kelly's cross-examination instead focused on the reduced charge to which he had pleaded guilty.

The following colloquy occurred between the prosecutor and Kelly at the petitioner's criminal trial:
"Q. Now, what was your understanding of what your sentence would be?
"A. It wasn't no understanding [of] what I was getting sentenced to; it was just that.
"Q. Well, what was the maximum [sentence] that you are looking at?
"A. Twenty-five years."

The respondent contends, including in oral argument before this court, that, when understood "in context" from Kelly's point of view, Kelly clearly believed the prosecutor was asking him only whether there was an agreement about his particular sentence, and he answered accordingly. However, our examination of whether the testimony was misleading is undertaken not from Kelly's point of view but from the perspective of the jurors; Adams v. Commissioner of Correction , supra, 309 Conn. at 369-73, 71 A.3d 512 ; who are not well versed in the nuanced vagaries of leniency agreements or the " 'wink and nod' " nature of such promises. See, e.g., Gilday v. Callahan , 59 F.3d 257, 269 (1st Cir. 1995) (disclosure of "understanding" between defense counsel and prosecutor "would have permitted the jury reasonably to infer that, even if the 'wink and nod' deal had not been explicitly communicated to [the witness], he must have been given some indication that testimony helpful to the government would be helpful to his own cause"), cert. denied, 516 U.S. 1175, 116 S.Ct. 1269, 134 L.Ed. 2d 216 (1996) ; see also Note, "Rational Expectations of Leniency: Implicit Plea Agreements and the Prosecutor's Role as a Minister of Justice," 51 Duke L.J. 1333, 1334-35 (2002) (describing witnesses' "rational expectation of leniency" notwithstanding absence of formal plea agreement). Although it is possible the jury understood all three questions to relate only to the length of any ultimate sentence Kelly might receive, the jury might have considered the first two questions to relate only to promises of a specific sentence, but they might have understood the last question to relate more generally to "any understanding" or benefit that might flow from Kelly's decision to "[come] in here and testif[y]." (Emphasis added.) For similar reasons, I do not agree that testimony-even credible testimony-more than a decade later about what the prosecutor understood from Kelly's answers (or even what the prosecutor intended by his questions) is probative of what jurors might have reasonably understood.

To be clear, I do not conclude that any misimpression about Kelly's incentive to testify, elicited on direct examination, was the product of the prosecutor's attempt to deceive the jury. As the respondent's counsel candidly admitted in his brief and in oral argument before this court, the prosecutor's questions were "ambiguous" and "inartful," resulting in "equally ambiguous" answers. But the obligations of Brady apply "irrespective of the good faith or bad faith of the [prosecutor]." Brady v. Maryland , supra, 373 U.S. at 87, 83 S.Ct. 1194 ; see also State v. Jordan , 314 Conn. 354, 370, 102 A.3d 1 (2014) (applying Brady principle that prosecutor's good faith intent is similarly irrelevant in Napue and Giglio cases, including when prosecutor fails to correct witness' potentially misleading testimony). To attempt to avoid any ambiguity and potential misimpression, I agree with both the majority and the respondent that, when a prosecutor seeks to expose an understanding or agreement between the state and a cooperating witness, the better practice is for the prosecutor to ask leading questions that accurately describe the nature of any agreement between the witness and the state. See text accompanying footnote 18 of the majority opinion.